# WHEELING.

LAUREL FORK & SAND HILL RAILROAD CO. *v.* WEST VA. TRANSPORTATION CO.

Submitted June 25, 1883.—Decided December 13, 1884.

1. Railroad companies are common carriers engaged in a public employment affecting the public interest, and are subject to legislative control as to their rates of fare and freight, just as any natural person, who is a common carrier, is subject to such legislative control. (p. 342.)

2. Railroad corporations, which devote their property to a use, in which the public has a direct interest, in effect grant to the public an interest in such use, and must to the extent of that interest submit to be controlled by the public for the common good, as long as they maintain the use; but they may withdraw the grant by discontinuing the use. (p. 340.)

3. There is a marked difference between such corporations as those spoken of in the last point, and purely private corporations. The former may be called *quasi* public corporations; and the legislature of the State has over their employment of their property so devoted to a use, in which the public has an interest, a control, which it does not have over the employment of the property of a purely private corporation. The legislature can generally exercise no control, which is forbidden by the charter of a purely private corporation. (p. 341.)

4. Though a railroad corporation by its charter is given "the power to contract in reference to its business the same as private individuals," or is authorized "to demand and receive such sum or sums of money for the transportation of persons and property and for the storage of property, as it deems reasonable," or though it is authorized to "carry freight and passengers charging reasonable terms" or though by its charter it is authorized to charge a certain fixed rate, which is declared by its charter to be irreducible by the legislature, and though no right to repeal, alter or amend the charter is reserved to the legislature in the act granting such charter, still the legislature has a right subsequently to

establish by a general act a maximum rate of charges for the transportation of passengers and freight, and to make it applicable to railroad companies, who were, when the act was passed, operating their railroads under such previously granted charters. (p. 342.)

5. Irrevocable grants of franchises to corporations, which impair the supreme authority of the State to make laws for the right government of the State, must be regarded as mere licenses and not as contracts, which bind future legislatures ; for no legislature can give away or sell the discretion of subsequent legislatures in respect to matters, the government of which from the very nature of things must vary in varying circumstances. (p. 342.)

6. The right to regulate and fix at their pleasure the charges of railroad companies for transportation of freight and passengers is one of the powers of the state inherent in every sovereignty, to be exercised by the legislature from time to time at its pleasure, and therefore one legislature cannot by a charter granted to a railroad company, though it be for a valuable consideration, confer on such railroad company a right to charge certain fixed rates for the transportation of freight and passengers, and stipulate that this rate of charge shall not be changed by future legislatures. If that be done, it will not be regarded as a contract but in legal effect as nothing more than a license to enjoy this privilege conferred on the corporation for the time subject to future legislative or constitutional control.   (p. 364.)

7. If in a special act of the legislature of this State chartering a company and conferring on it specified privileges exceeding those granted to other like corporations by the general law of the State there be reserved a right to amend this act by a future legislature, and the legislature subsequently passes a general act applicable to all corporations of this character, whereby the specified privilege, while not withdrawn, is so modified as to render it far less valuable to the corporation, which had been chartered by this special act, this cannot be regarded as an exercise by the legislature of the reserved right to amend any act, as it can not properly be called an amendment of this special act ; for by our Constitution, Article 6, Section 30, it is provided, that "no law shall be amended by reference to its title only ; but the section amended shall be inserted at large in the new act."   But such general act is not necessarily inoperative on such corporation, as it may or may not be subjected to such law ; this depending upon whether the legislature has the constitutional power so to control the corporation in this respect.   (p. 371.)

8. Chapter 227 of the Acts of 1872-3, passed December 27, 1873, entitled "an act to establish a reasonable maximum rate of charges for the transportation of passengers and freight, and to prevent

unjust discrimination and extortion in the rates to be charged by different railroads in this State for the transportation of passengers and freight on said railroads" is applicable to all railroads in this State, whether their charters were granted before or since the passage of this act; and it is binding on all railroad companies doing business in this State without regard to any provisions, which may have been inserted in their charters. The legislature had a constitutional right to pass this act; and no previous legislature had a right to so restrain or limit this legislature as to take from it the right to fix the maximum rates of charges of all railroads in the State, as it pleased. And any provision in the charter of a railroad company purporting to restrain the legislature in this respect can not be regarded as a contract, but must be regarded as a mere license revocable at the pleasure of the legislature. (p. 373.)

Statement of the case by GREEN, JUDGE:

On February 14, 1871, the West Virginia Transportation Company entered into an agreement under seal with the Laurel Fork and Sand Hill Railroad Company, whereby for a valuable consideration, set out in this agreement, it covenanted to pay to the Laurel Fork and Sand Hill Railroad Company certain specified percentages on charges made for the transportation of oil shipped by the West Virginia Transportation Company, certain parts of which were to be shipped over the railroad of the Laurel Fork and Sand Hill Railroad Company. Under this agreement prior to June 1, 1872, the West Virginia Transportation Company had shipped 10,321 barrels of oil, for which under that agreement it then owed The Laurel Fork and Sand Hill Railroad Company $1,070.75, which it did not pay, as by this agreement it covenanted to do. Thereupon The Laurel Fork and Sand Hill Railroad Company brought an action of covenant on this agreement for this breach thereof by the West Virginia Transportation Company. The declaration was filed at October Rules, 1872.

The defendant filed several pleas, on which issue was joined, among them the plea of set-off. On June 28, 1875, the defendant filed its specifications of sets-off, which consisted of a minute and detailed statement of over-charges, which it had paid to the plaintiff for the transportation of oil over its railroad, these over-charges having been made by the plaintiff, and paid by the defendant between April 1, 1874, and December 1, 1874, amounting in all to $2,000.94.

The case was by a consent-order made by the court referred to an arbitration; but subsequently this order was by consent set aside, and the parties agreed to a case, which they submitted to the court for its decision.   The agreed case was as follows:

"The parties to the above action, by their attorneys, agree to the following facts, viz:

"First.—That the plaintiff was incorporated by an act passed February 28, 1866, by the Legislature of West Virginia, entitled 'An act to incorporate the Laurel Fork and Sand Hill Railroad Company.'   See Acts 1866, page 112, to which reference is here made for full citation of said act.

"Second.—That section eight of said charter conferred on the plaintiff the right to charge for transportation of persons or produce and other duties, such charges or rates as may be deemed by the plaintiff just, provided that the charge for transporting oil shall in no case exceed the sum of 75 (seventy-five) cents per barrel, &c.

"Third.—That section nine gives said company the benefit of the provisions of the Code of Virginia, second edition, chapters 56, 57 and 61, (fifty-six, fifty-seven and sixty-one,) and other general laws relating to such companies, &c., as set forth in said section nine.

"Fourth.—That the said plaintiff's charter was amended by an act passed by the same Legislature, February 21, 1868, entitled 'An act supplementary,' &c., of said act of February 28, 1866, to which reference is here made for full citation. See page 30 of the Acts of 1868.

"Fifth.—It is further agreed that the said plaintiff in good faith continued and equipped its said railroad under its said charter, and has been continuously operating the same as required by law.

"Sixth.—That it has paid during its existence the sum of $18,000.00 as taxes and levies into the State and county treasuries.

"Seventh.—That it has not realized from the business of said railroad, since its operations began, net profits, out of which dividends might be declared, exceeding fifteen *per centum per annum* on the capital stock invested, and that, in fact, at no time has the profit of said railroad justified a

dividend of six *per centum per annum.* And reference is here made to section 42 (forty-two,) 43, (forty-three,) 44, (forty-four) and 45 (forty-five) of the said chapter 61 (sixty-one) Code of Virginia, second edition. Said chapter is made a part of the charter of the said plaintiff.

"Eighth.—That the said plaintiff never extended its road as provided in the act of February 21, 1868.

"Ninth.—That the plaintiff and the defendant made and sealed the contract described in the plaintiff's declaration, and alleged to have been broken by the defendant in not paying to the plaintiff the percentage on transportation of oils, as provided in said covenant, and that by virtue of said covenant the defendant has shipped oils prior to the commencement of this suit in the following quantities, which it has not accounted for and paid to the plaintiff, as it was bound to do by said covenant, viz:

"For freight on 385.68-100 barrels oil to Volcano, in April, "1872, @ 20.................................................................... $77 12
"For freight on 7,550.89-100 barrels oil to Petroleum, in April, "1872, @ 10.................................................................... 755 09
"For freight on 2,385.37-100 barrels oil to Petroleum, from "April 30, 1872, to May 15, 1872 .................................. 238 54
                                                                        ———
                                                    "$1,070 75

"Tenth.—That the said freight so unaccounted for and ——— percentage under said covenant amount to the sum of $1,070.75, with interest theron from the 1st day of June, 1872, until paid.

"Eleventh.—The defendant has filed as sets-off to plaintiff's claim an account for freight paid since the commencement of this suit in the year 1874, which items in said offsets as alleged are charges on rates of freight which the defendant claims the plaintiff collected from it beyond the rates fixed for transporting oil by an act of the Legislature hereinafter mentioned, which claim for overcharges amounts to the sum of $2,000.94.

"Twelfth.—That the defendant claims said offsets of overcharges under the act of of the Legislature of West Virginia, passed December 27, 1873, entitled 'An act to establish a reasonable maximum rate of charges,' &c. Acts of 1872, chapter 22, page 710, &c.

" Thirteenth.—The plaintiff and defendant agree that as a matter of fact the plaintiff had never in any manner accepted the provisions of the last mentioned act of the Legislature, chapter 227, as an amendment of the charter of the plaintiff, but that it has always refused to recognize said act as an amendment of its charter, and still refuses, and denies that its charter is subject to any such amendment without its assent, so far as the act or any such act undertakes to change the rates of toll prescribed in its original charter, referring to section 42, chapter 61 (sixty-one) Code of Virginia, second edition; and it is agreed that the plaintiff denies and contests the right of the defendant to said offset or account of any such alleged over-charges beyond the rates of toll for oil as prescribed by said chapter 227, Acts of 1872–3, page 710, &c.

" Fourteenth.—The parties further agree to submit the said cause to the court on this agreement of facts. If the court shall be of opinion that the defendant is entitled to recover the said alleged over-charges as said offset, or, in other words, if the said last mentioned act of the Legislature do legally and constitutionally modify the said charter of the said plaintiff as to the said rates of toll, then the judgment will be for the defendant's offsets less the amount of the claim of the plaintiffs for $1,070.75, due from the defendant under the covenant aforesaid. But it is understood and agreed that the plaintiff relies on the ground that the said act of 1872–3, chapter 227, so far as the same affects the rights of the plaintiff, without its assent, to charge the rates of toll for transportation of oils, not to exceed seventy-five cents per barrel as aforesaid, is in violation of the tenth section of the first article of the Constitution of the United States.

" Fifteenth.—And if the court shall be of opinion that the defendant is not entitled to said account of overcharges as alleged, then the judgment shall be for the plaintiff for the said sum of $1,070.75, with interest as aforesaid, and costs.

" JNO. A. HUTCHINSON, *Attorney for Plaintiff.*

" WALTER S. SANDS, *Attorney for Defendant.*" ·
" March, 1879."

The court on this agreed case on April 1, 1879, found for the plaintiff, and rendered a judgment against the defendant for $1,070.75 with interest thereon from June 1, 1872, and costs.

The defendant filed a bill of exceptions to this rendition of judgment for the plaintiff, in which bill the agreement sued on and this agreement of consent are set forth. A writ of error and *supersedeas* was awarded to this judgment on the petition of the defendant.

*W. S. Sands* for plaintiff in error.

*J. A. Hutchinson* for defendant in error.

GREEN, JUDGE:

The sole question of controversy in this case, as stated in the petition for the writ of error and in the argument in this Court, is: Did the plaintiff below, the Laurel Fork and Sand Hill Railroad company, have a right at all times to charge seventy-five cents per barrel for the transportation of oil over the whole length of their railroad, as authorized by the eighth section of chapter 113 of the Acts of 1866, that act being the original charter of the company, or did the right to make so large a charge for transportation cease after April 1, 1874, when chapter 227 of Acts of 1872-3 went into effect, or were they after that date bound to charge for the transportation of oil at the rates prescribed by chapter 227 of Acts of 1873, which established reasonable maximum rates of charges for the transportation of freights by all the different railroads in this State? It being agreed on the trial of the case in the circuit court, that if the plaintiff below, this railroad company, was entitled to charge for the transportation of oil the rate fixed by its said charter passed February 28, 1866, then the judgment should be for the amount, for which the judgment was rendered in the court below, $1,070.75 with interest from June 1, 1877 until paid and costs; but if after April 1, 1874, the plaintiff below, this railroad company, had only a right to charge for oil transportation over this road at the rate of charges fixed by chapter 227 of Acts of 1872-3, then the judgment of the court below should be for the defendant's set-off $2,000.94 of principal less said amount of plaintiff's claim $1,070.75.

Before I enter into a consideration of the various provisions of the different acts of the legislature of West Virginia, which constitute, as is claimed, portions of the charter of

this railroad company, and which, it is claimed, materially bear on the question submitted to this Court for its decision, as presented by this record, I will review the powers of the legislature to regulate and fix the maximum charges on railroads generally. As there is much diversity of opinion on this point, I propose to investigate the fundamental principles, on which in my judgment should depend the existence or non-existence of such a power in the legislature.

Natural persons are divided by the text-writers into two classes, private persons and public officers. A private person with the exception of those engaged in certain sorts of businesses, which I will presently specify, have a right to charge for their services any price, which the party they contract with is willing to pay; and if the party, for whom such private person proposes to render services, is unwilling to pay for his services the price which he demands, he is under no obligations to render his services, and he is at perfect liberty to decline doing so. No court will require of him to render services for such party. If he chooses to do so, he may by contract fix the price of his services, and the courts will enforce the price, which he has thus fixed on his services by contract; and no legislature in this country could by statute-law require such person to render services at a price fixed by the legislature.

The reverse of all this is admittedly true with reference to public officers. They have no right to charge for their services any price which the party, with whom the public officer contracts, is willing to pay. If a party, for whom a public officer is asked to render a service as such public officer, is unwilling to pay for such service the price, which the public officer demands, he is nevertheless under an obligation to render such services on being paid the price, which the courts or the statute-laws have fixed as a reasonable compensation for such service. If by contract he fixes a price for such services in excess of the reasonable price fixed by the law, the court will not only not enforce such contract as in the case of a private person, but will punish such public officer for his attempted extortion. Our legislatures habitually fix by statute-law the fees and charges, which public officers may charge for their services; and these

officers may be compelled to perform these services for all parties at these fixed prices; and a failure to do so subjects them to penalties and punishments prescribed by the legislature. Public officers are also controlled and governed by acts of the legislature not only in these respects but also in all other respects, and unless in some particular case their salaries or fees for services rendered are fixed by the constitution, as they rarely are, they may be changed or reduced by acts of the legislature at its pleasure; and such statutes may be made applicable not only to public officers to be appointed in the future but also to public officers holding their offices, when such statute-law is passed. In short, while neither the legislature nor the courts in these and most other respects can control the conduct or charges for services of private persons, these bodies have as a general rule unlimited control over the conduct and charges for services of public officers. This is admitted by all to be the law governing natural persons, the law as applicable to private persons and public officers being thus in marked and strong contrast.

The law applicable to artificial persons or corporations is in these respects very similar to the law applicable to natural persons and is obviously based on like grounds. Chief Justice Marshall in *Dartmouth Colleye* v. *Woodworth* 4 Wheat. 626 thus describes such artificial person: "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being a mere creation of the law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed best calculated to effect the objects for which it was created. Among the most important are immortality and, if the expression may be allowed, individuality. They enable a corporation to manage its own affairs, and to hold property without the perplexing intricacies—the hazardous and endless necessity of perpetual conveyances, for the purpose of transmitting it from hand to hand. It is chiefly for the purpose of clothing bodies of men in succession with these qualities and capacities, that corporations were invented and are in use. By these means a perpetual succession of individuals is capable of acting for the promotion of the particular object like one immortal being."

As natural persons are generally divided by text-writers into two classes based on the character of their business, so artificial persons are by text-writers also divided into two classes with reference to the character of their business. Corresponding to the private person is the private corporation created for private purposes or for the pecuniary gain of its members; and of course they do not cease to be private corporations, simply because the legislature supposed, as it always does, that their creation or establishment would promote indirectly or consequentially the public interest. On the other hand public corporations is that class of artificial persons corresponding to public officers in the division of natural persons into classes. These public corporations are created for governmental purposes generally; or they may be created for business-purposes and will still be public corporations, if the whole interest in the corporation belongs to the government.

Corporations whether private or public are, as I have stated, artificial persons, possessing those rights and properties only, which their charter confers on them either expressly or as necessarily incidental to their existence and to the carrying out of the purposes, for which they are created. But neither the courts nor the legislatures can control the conduct or actions of a private corporation, when acting within the scope of the powers conferred upon it by its charter, any more than they can control the conduct of a private person in his business. If for instance a corporation is allowed to do a certain business rendering services to others in such business, it may as a general rule charge for its services whatever the party doing business with it may agree to pay, just as a private person may do. To this it is true there are some exceptions arising from the character of the business; but these exceptions are just as applicable to a private corporation as to a private person engaged in such business and no more so. Of these exceptions to the general rule I will speak more at large presently. On the other hand the courts to a certain extent and the legislature to any extent, it may please, can control the conduct and action of a public officer or of a public corporation. Thus a legislature may at any time reduce the fees or charges

for the services of a public officer; and it is entirely unimportant, whether such public officer accepted his office after the passage of a law reducing his fees, or whether he was a public officer when such law passed; for he has no vested rights of any sort by reason of his being a public officer, which are not under the absolute control of the legislature. So too a public corporation can have no vested rights of any sort under its charter, which are not under the absolute control of the legislature. The charter of a public corporation may be modified or repealed entirely by the legislature at any time. In this respect it is just like a public officer, whose office may be modified or entirely abolished by the legislature.

But while text-writers have divided natural persons into these two classes, private persons and public officers, yet the decided cases show, that from a very early period the courts have recognized, that at common law there was a third class of natural persons, who, though called by text-writers private persons, did not possess all the rights belonging to private persons generally, and who were by law subject to certain recognized obligations, to which no other private persons were subject. This class of natural persons has been sometimes called *quasi* public officers. Had they been so habitually called by text-writers, and natural persons formally divided into three classes, private persons, public officers and *quasi* public officers, it is believed, that no small amount of controversy and confusion would have been avoided. But because of this failure to recognize these *quasi* public officers as a distinct class, and because they are consequently confounded with private persons as a class, confusion has arisen and it has at times been contended, that the rights and obligation of these *quasi* public officers were identical with those of private persons as stated above.

Who then according to the decisions constitute this third class, these *quasi* public officers; and in what do their rights and duties differ from private citizens? This third class according to the decisions are owners of private property, who devote it to a use, in which the public has an interest. The rates of charges for the use of property, in which the public thus has an interest, may be fixed or limited by legisla-

tive enactments, just as the rates for charges by public officers are fixed. And if the legislature has not fixed the charges to be allowed to the owner for the use of such private property, of which the public has a use, the courts will allow the owner only a reasonable charge for its use and will compel him to give the use of it in the manner, in which he has devoted it to the public, to any individual upon his paying a reasonable price therefor; and the courts will neither permit him to refuse to give any one individual such use of such property, nor will they permit him even by contract to demand more than a reasonable price for such use. In other words, the public by the legislature or by the courts control the use of such private property so devoted to the public use. Whenever the owner of private property thus devotes it to a use, in which the public has an interest, he in effect grants to the public an interest in such use, and he must to the extent of that interest submit to be controlled by the public for the common good, so long as he maintains such use; and if he would withdraw his grant to the public, he must discontinue such use.

That eminent jurist Lord Chief Justice Hale more than two hundred years ago said, that when private property was " affected with a public interest, it ceases to be *juris privati* only." See his treatise *De Portibus Maris*, 1 Hargrave's Law Tracts 78. And in his treatise *De jure Maris*, he says, 1 Hargrave's Law Tracts 6 : " He" (a private person) " may make a ferry for his own use but not for the common use of all the King's subjects passing that way; because it doth in consequence tend to a common charge, and it becomes a thing of public interest and use, and every man for his passage pays a toll, which is a common charge and every ferry ought to be under a *public regulation*, viz : that it give attendance at due times, keep a boat in good order, and take but reasonable toll ; for if he fail in these he is finable." And again in his treatise *De Portibus Maris*, Hargrave's Law Tracts 78, he says further : " A man for his own private advantage may in a port or town set up a wharf or crane and take what rates he and his customers can agree for cranage, wharfage, houselage, pesage ; for he doth no more than is lawful for any man to do, viz: makes the most of his own. * * * If

the subject have a public wharf into which all persons who come to that port must come and unload or load their goods because there is no other wharf in that port; in that case there cannot be taken arbitrary and excessive duties for cranage, wharfage, pesage, &c., neither can they be enhanced to an immoderate rate; but the duties must be reasonable and moderate, though settled by the King's license or charter. For now the wharf and crane and other conveniences are affected with a public interest and they cease to be *juris privati* only; as if a man set out a street in or near a building on his own land, it is no longer bare private interest, but is affected by a public interest." This was approved by Lord Kenyon in *Bolt* v. *Stennett,* 8 L. R. 606.

Lord Ellenborough in *Aldnutt* v. *Ingles,* 12 East 537, says: " There is no doubt that the general principle is favored both in law and justice, that any man may fix what price he pleases upon his property or the use of it; but if for a particular purpose the public have a right to resort to his premises and make use of them, and he have a monopoly in them for that purpose, if he will take the benefit of that monopoly, he must as an equivalent perform the duty attached to it on reasonable terms."

The principles laid down in the English courts have been followed in this country. Thus in *Mobile* v. *Yuelle,* 3 Ala. N. S. 140, the court being called upon to decide, whether the power granted to the city of Mobile to regulate the weight and price of bread was constitutional, it was contended, that " it would interfere with the right of the citizen to pursue his lawful trade or calling in the mode his judgment might dictate." The court said : " There is no motive * * * for this interference on the part of the legislature with the lawful actions of individuals, or the mode in which private property should be enjoyed, unless such calling affects the public interest, or private property is employed in a manner which directly affects the body of the people. Upon this principle, in this State tavern-keepers are licensed * * * * and the county court is required at least once a year to settle the rates of inn-keepers. Upon the same principle is founded the control, which the legislature has always exercised in the

establishment and regulation of mills, ferries, turnpikes, roads and other kindred subjects."

The most usual application in England or in this country of the principles, which I have laid down above, is to common carriers, that is, persons, who undertake for hire or reward to transport from place to place the persons or the goods of those who choose to employ them.  Such are the proprietors of stage-coaches and omnibuses, carters, expressmen, porters, ship-owners, in short all who engage in the transportation of persons or goods for money either from town to town or from place to place in the same town.  All such persons are bound to so transport, whenever called upon to do so, and can not decline to do so for a particular person at their pleasure.  They are bound to receive and carry all goods offered for transportation subject to all the responsibilities incident to their employment, and are liable to an action in case of refusal (*New Jersey Steam Navigation Co.* v. *Merchant's Bank*, 6 How. 382); and they are bound to charge for such transportation only a reasonable sum, and they can not demand, as a private carrier might, whatever they choose and, if such unreasonable demand is not complied with, decline to transport the goods.  (*Hunill* v. *Owens* 1 Dev. and Bat. (N. C.) 273.)

In fact, as shown by any of the text-writers, common carriers are subject in very many respects to be controlled by the courts or the legislature and are habitually so controlled in many respects, in which private persons are not and can not be controlled.  The duties and responsibilities thus imposed by the law, some of which the common carriers can not change by any contract they may make, are numerous and based on the fact, that the business of common carriers is such, that they are affected with a public interest and therefore subject to public control.  This control has been long and habitually exercised over them.  Thus a statute in England was passed fixing their charges as long ago as the third year of William and Mary (3 W. & M. ch. 12 § 24 3 Stat. at Large (Great Brittain) 481.)

In the case of *New Jersey Navigation Co.* v. *Merchant's Bank* 6 How. 382 common carriers are spoken of as exercising a sort of *public* office having duties to perform, in which the

public is interested. There never has been a question but that the business of a common carrier was "affected with a public interest," and that they were therefore like other *quasi* public officers subject to public control. This whole subject of the right of the public to control all sorts of persons, whose business is "affected with a public interest," has been fully and ably considered in the case of *Munn* v. *Illinois*, 94 U. S. (4 Otto) 113. In that case it was decided by the court, that "it had been customary in England from time immemorial and in this country from its first colonization to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, inn-keepers, &c., and in so doing to fix a maximum charge to be made for services rendered accommodations furnished, and articles sold;" and this because the regulation of the use of property or of business "affected with a public use" is necessary for the public good. And this right to regulate all such business and fix the charges for the use of property affected with a public use is in no manner affected or prohibited by the Fourteenth Amendment of the Constitution of the United States or any other provisions of the Constitution of the United States.

There is then in these cases a distinct recognition of a third class of natural persons distinct from that of private persons or public officers, the usual division by text-writers of natural persons. This third class I would designate as *quasi* public officers and it would include common carriers, hackman, bakers, millers, wharfingers, inn-keepers and all other persons who have devoted their property to a use in which the public has an interest; and this class of persons must to the extent of this interest submit to be controlled by the public through the courts or by the legislature from time to time for the public good, which control must continue as long as the property is devoted to this public use, and may be exercised by the courts by requiring such person to permit the use of his property, so devoted to the public, by any such person on the payment by him of a reasonable compensation, if the legislature has failed to fix such compensation; or such control may be exercised by the legislature by fixing from time to time at its pleasure the maximum compensation for the use

of such property and for the service of the owner in connection therewith.

This reasoning and these views are expressed by the Supreme Court of the United States in *Munn* v. *Illinois* 94 U. S. (4 Otto) 113, in which the whole court concurred excepting Justices Field and Strong, whose views are expressed in the opinion of Justice Field, p. 156.   He denies, that, when the owner of property devotes it to a use, in which the public has an interest, he in effect grants to the public an interest in such use and must to the extent of that interest submit to be controlled by the public for the common good.   He insists, that the public has only a right to control the use of private property, when the owner has directly granted its use to the public, or when the public has conferred special privileges on the owner in the use of his private property and in consideration of such special privileges has undertaken to require the owner of such private property, who enjoys these privileges, as a condition, on which he should have them, that he should submit to such control by the courts or legislature.   He thinks the control thus exercised by the public in the use of ferries, bridges, turnpikes, wharfingers, hackmen and draymen, is because of special privileges conferred in some cases on these classes, and when in any particular case no such special privileges are conferred, the public has no right to such control.   The supposed special privileges conferred on hackmen and draymen, which gives the public a right to control them in their prices, is to use the stands on the public street, and this however trifling in value, as it belongs to hackmen and draymen and not to ordinary coachmen or laborers with teams, is a sufficient warrant for the public regulation of their fares.   He points out the special privileges conferred on the other classes above named, on which, he supposes, this right of the public to control them is based in cases where such special privileges are conferred.   But he does not even attempt to show that in numerous cases, in which the courts as well as the legislatures have controlled common carriers of different sorts and bakers, inn-keepers and some others, this public control could be considered as a condition, upon which they should have some special privileges, or indeed that any special privilege was conferred on

them, though nevertheless the public has controlled the prices
charged for the use of their property, simply apparently be-
cause the owner of the property has devoted it to a use, in
which the public has an interest.

I cannot therefore think, that Justices Field and Strong
have discovered the true ground, on which the public has ever
claimed and exercised the right to control the prices charged
for the use of private property, which the owner has devoted
to a use, in which the public has an interest, and that the
majority of the court have assigned the true reason, why the
public in such cases can control the prices to be charged for
the use of such property, though it be private property, that
is, that " the owner has in effect granted to the public an in-
terest in the use of such private property."

It being thus determined, that beside the usual division to
be found in the text-books of two classes of natural persons,
private persons and public officers, there is a distinct class of
natural persons, a third class, which may be called *quasi* pub-
lic officers; and that natural persons are in general not liable
to be controlled by the courts or the legislatures with reference
to their business or mode of conducting it; and that for the
use of their private property or services they may charge
whatever those who use their private property or obtain their
services, may agree by contract to pay, where no imposition
or fraud exists, and that public officers who in all their pub-
lic business are subject to the control of the courts to a large
extent and to the absolute control of the legislature in all re-
spects; and especially that the legislature may from time to
time regulate by statute-law, as they may suppose the pub-
lic interest may require, the charges for services or fees of
all public officers, whether in office when such statute passes
or not; and that this third class of persons, who are engaged
in a business affected with a public interest as above ex-
plained, may be controlled by the courts to the extent of re-
quiring that they charge for the use of their property devoted
to the use of the public or for service connected therewith
only a reasonable price, which is subject to this and still fur-
ther control by the legislature, it would seem to follow as a
matter of course, that there must be a third class of artificial
persons besides private and public corporations, which third

class must correspond with this third class of natural persons, and which we may call *quasi* public corporations, and which must be subject to the same public control by the courts and by the legislature, to which this third class of natural persons, *quasi* public officers, are subject. These we will call *quasi* public corporations, and the prices charged for the use of their private property are clearly subject to the control of the courts or of the legislature, which has a right from time to time by general statute to regulate the prices charged for the use of their property or for their services connected therewith.

This third class or *quasi* public corporations are those, who are chartered to conduct a business, in which they devote to a use, in which the public has an interest, their own property ; for by engaging in such business such a *quasi* public corporation grants to the public an interest in the use of their property, and to the extent of that interest must submit to be controlled by the public for the common good. If owners of ferries, common carriers, hackmen, bakers, millers, wharfingers, inn-keepers and others, who devote their property to a use, in which the public has an interest, must to the extent of that interest submit to be controlled by the public, as we have seen they must whether individuals or partnerships, it would seem clear beyond dispute, that corporations engaged in exactly the same sort of business must as a matter of course to the extent of the interest of the public in the use of their private property devoted to such use submit to be controlled by the public for the common good. It would seem obvious, that, as natural persons engaged in these kinds of business are subject to be controlled by general statute-laws passed by the legislature from time to time, as the public interest may require, as to the maximum price which they may charge for the use of their private property, the use of which is thus devoted to the public, as well as for their services connected therewith. So too *quasi* public corporations engaged in the same sort of business must be subject to the control of the legislature from time to time as to the maximum price, which they may charge for the use of their private property, the use of which is thus devoted to the public, as well as their services connected therewith.

Thus a common carrier, a natural person, may, as we have seen, be controlled by acts of the legislature passed from time to time as to the maximum charges, which he may make for the transportation of persons or property. So too a railroad company by its charter being authorized to conduct the business of a common carrier must in like manner be subject to be controlled by acts of the legislature fixing its maximum charges for the transportation of persons or goods, as the public good may require. This is exactly what I understand to have been decided by the Supreme Court of the United States in what are commonly known as the Granger cases, reported in 94 U. S. (4 Otto) 155–187. These cases were all railroad cases; and in all of them it was held, that the legislature had a right by general statute-law to control the charges of these railroads for the transportation of passengers or freight by fixing a maximum price for such charges, though such general statutes were passed after the charters of these several railroad companies had been granted. These cases were all decided on the principles laid down in *Munn.* v. *Illinois,* 94 U. S. (4 Otto) 113; and the judges, Field and Strong, who dissented in that case, dissented in each of these cases.

The first of these cases was *Chicago, &c. Railroad Company* v. *Iowa,* 4 Otto, 155. The Burlington & Missouri Railroad Company, lessee of the plaintiff, by its charter granted by the State of Iowa " had the right to fix, determine and establish the tariff of rates for the transportation of freight and passengers over its road and branches;" yet it was decided in this case, that the railroad company was subject to the control of the legislature of Iowa as to its rates of fare and freight by such laws, as the legislature of Iowa might from time to time enact.

The next of these cases were *Peik* v. *Chicago & Northwestern Railway Company,* and *Lawrence* v. *Same,* 164. In these cases the court decided, that though the charter of this railway company authorized it "to demand and receive such sum or sums of money for the transportation of persons or property and for storage of property, as it shall deem reasonable," yet as the constitution of Wisconsin, when this charter was granted, provided that all acts for the creation of corporations in this State " may be altered or repealed by the legislature

at any time after the passage," the legislature had power to prescribe a maximum of charges to be made by said company for transporting persons and property within the State; and, as I understand the court, the decision would have been the same, though there had been no such provision in the Wisconsin constitution.

In the next case, *Chicago, Milwaukee & St. Paul Railroad Company* v. *Ackley*, p. 179, it was decided, that a railroad company in Wisconsin cannot recover for the transportation of property more than the maximum fixed by a general statute passed March 11, 1874, by proving that the amount charged was no more than a reasonable compensation for the services rendered.

The next of these cases was the *Winona & St. Peters Railroad Company* v. *Blake*, p. 180.   The charter of this company granted by Minnesota incorporated it as a common carrier with all the rights and subject to all the obligations the name implies.   It was bound to carry, when called upon for that purpose, and allowed to charge only a reasonable compensation therefor.

The same decision was rendered in the next of these cases, *The Southern Minnesota Railroad Company* v. *Coleman*, p. 181, and in the last of these cases, *Stone* v. *Wisconsin*, p. 181, the court decided as it did in *Chicago, Milwaukee & St. Paul Railroad Company* v. *Ackley*, so far as it stated the point decided in that case.

In all these Granger cases Justices Field and Bradley dissented, as they had done in *Munn* v. *Illinois*, 94 U. S. (4 Otto) 113.   Their dissenting opinion was delivered by Justice Field in the last of the cases, 94 U. S. (4 Otto) 183.   The position taken by these dissenting justices I will briefly state using in so doing, as far as I can conveniently, the language of Justice Field.   He says on page 184:

" The questions presented in these cases are of the greatest importance, and their solution must materially affect the value of property invested in railroads to the amount of many hundreds of millions of dollars, and will have a great influence in encouraging or repelling future investments in such property.   They were ably and elaborately argued by eminent counsel and nothing was omitted which would have in-

formed or enlightened the court. The opportunity was presented for the court to define the limits of the power of the State over its corporations, after they have expended money and incurred obligations upon the faith of the grants to them, and the right of the corporations so that, on the one hand, the property interest of the corporation would be protected from practical confiscation, and on the other hand, the people would be protected from arbitrary and extortionate charges. This has not been done ; but the doctrine advanced in *Munn* v. *Illinois*, 94 U. S. 113 has been applied to all railroad companies and their business, and they are thus practically placed at the mercy of the legislature of every State."

This in my judgment is a fair interpretation of the decisions rendered in these Granger cases. In another place however he represents the scope of these decisions as more limited, and says that in these Granger cases " unlimited power over every railroad corporation in respect to the business it should carry on and the compensation it should receive, was asserted, except when these were specifically designated and permanently fixed in the charter."

I do not understand, that in the decisions rendered in these Granger cases there was any such qualification of the unlimited power asserted. This unlimited power, as I understand these cases, was asserted to exist over every railroad corporation without any exception. It would seem from the language of Justice Field, which I first quoted, he himself so thought. But it is true, in the first of these Granger cases Chief Justice Wait (94 U. S. p. 161), did speak of there being such exceptions. But I regard this as a mere *obiter dictum* and as inconsistent with the decision in *Munn* v. *Illinois*, 94 U. S. 113, and with the decisions rendered by the court in the Granger cases, and with subsequent decisions of the United States Supreme Court. I will comment hereafter on this *dictum* of Chief Justice Wait.

Justice Field then proceeds to find fault with the decision in *Munn* y. *Illinois* and seems to think, that the principles laid down in it could be applied to almost any trade, employment, manufacture or avocation; and that thus the entire capital and business of the country could be controlled by the legislature, and the prices of all private property or the price of

its use be fixed by the legislature at its pleasure and revised from time to time. He then proceeds:

"There is no doubt of the power of the legislature to prescribe in the charter of any corporation the compensation it may receive for services rendered, or to reserve the power to regulate such compensation subsequently. The power to prescribe the conditions of use and enjoyment necessarily accompanies the power to grant. But the charter of a corporation being a contract, a sufficient consideration for the privileges and franchises conferred being found in the duties and liabilities assumed by the corporations, the subsequent power of the legislature is restrained by its terms. This has been so often judicially declared, that it has been supposed to be no longer open to discussion. The first question therefore for consideration in all cases where legislation affects the constitution of a corporation, or its beneficial operation, is, what is the true construction of its charter, and, consequently, what privileges does it confer, and what restraint does it impose on legislative interference? The rights and privileges implied in the contract are equally inviolable as those expressed. This question is not met by the court in its opinion, the several causes being disposed of by the novel doctrine announced in *Munn* v. *Illinois*, 94 U. S. 113, that 'the legislature has a right to regulate the compensation for the use of all property and for services in connection with it, the use of which affects the 'community at large;' and the further doctrine equally novel, that though the charter of a company confers the power to make reasonable charges, the whole matter is reserved to be regulated by the State in its discretion."

And he concludes his dissenting opinion thus:

"So long as the decision in *Munn* v. *Illinois*, 94 U. S. 113 remains, it will be a waste of words to discuss the questions argued in these Granger cases. That decision in its wide sweep practically destroys all the guaranties of the constitution and of the common law invoked by counsel for the protection of the rights of railroad companies. Of what avail is the constitutional provision, that no State shall deprive any person of his property except by due process of law, if the States by fixing the compensation which he may

receive for its use, take from him all that is valuable in the property? To what purpose can the constitutional prohibition upon the State against impairing the obligation of contracts be invoked, if the States can in the face of a charter authorizing a company to charge reasonable rates prescribe what rates shall be deemed reasonable for services rendered? That decision will justify the legislature in fixing the prices of all articles and the compensation for all services. It sanctions intermeddling with all business and pursuits and property in the community, leaving the use and enjoyment of property and the compensation for its use to the discretion of the legislature."

It is obvious from this conclusion of the dissenting opinion in the last of the Granger cases, that the entire court including the dissenting members understood, that the case of *Munn* v. *Illinois*, 94 U. S. (4 Otto) 113 and the Granger cases 94 U. S. 155 to 187 settled, that the compensation for services by all railroad companies, no matter what provisions were inserted in their charters, could be fixed from time to time by the legislature of the State which granted the charter of such companies. This is obviously, as it seems to me, admitted by Justice Field as a necessary deduction from the principles settled in *Munn* v. *Illinois*, 94 U. S. 113. That case distinctly recognized, that there was a third class of natural persons, who were subject to public control. That there is any such class of persons, is denied by Justice Field, who says, that the holding of the doctrine that there is such a class, is a novel doctrine; but Justice Waite in *Munn* v. *Illinois* shows, that this doctrine is certainly more than 200 years old. The reason given for this doctrine by the court in that case is, that "when the owner of property devotes it to a use, in which the public has an interest, *he in effect grants to the public an interest in such use and must to the extent of that interest submit to be controlled by the public for the common good.*" This rule for this reason has always been applied to common carriers. Justice Field though very astute in his dissenting opinion suggests no reason why this rule has been applied to common carriers. If applied to private persons, who are common carriers, is it not equally applicable to railroad companies, who are nothing but common carriers? I know,

that while this rule has been without dispute or controversy applied to private persons, who are common carriers, it has been most strenuously resisted when applied to railroad companies. But in these Granger cases it was decided, as I understand them, and very properly decided to be equally applicable to railroad companies. The reason, I apprehend, of this strenuous resistance was simply the fact, that railroad companies have become very rich and powerful corporations, who were unwilling to have their charges for transporting goods and persons regulated by the public, though all other common carriers had ever submitted without controversy to have their charges regulated by the courts or by the legislature.

These decisions in these Granger cases Justice Field thought would "have a great influence in repelling in the future investment in railroads;" and he regarded, that property invested in railroads was made subject "to practical confiscation" by these decisions. (94 U. S. p. 184.) I can not see that these decisions are calculated to produce any such effect. "All railroad property is devoted to a use, in which the public has an interest." The interest, which the public has in this use, is of the greatest importance to the well-being of the public. If the legislature was to so reduce the charges of railroad companies as to operate as a practical confiscation of railroad property, as Justice Field seems to have feared, is it not obvious, that the legislature would inflict on the public, by whom they were elected, and whom they represent, a great wrong and injury? For in so reducing the charges of railroad companies far below what was just is it not obvious, that they would cripple these companies and finally break up and destroy the railroads? What greater injury could the legislature inflict on the public? I can not believe that the fixing of railroad charges could be put in safer hands to guard against injustice to railroad companies than in those of the legislature, who would be very cautious not to cripple or destroy railroads, on whose continuance and prosperity the public so much depend.

These Granger cases were decided in 1876; and almost every railroad company, which has been incorporated in the

United States since that time, has been subject to the control of its charges by the legislature not only by reason of these decisions but by express provisions inserted in their charters or in the constitutions of many of the States, which have granted these charters, yet it is notorious, that the amount of capital invested in railroads in the United States is increasing every year. The increase of late has been enormously rapid. The fact is conclusive, that no practical mischief can result from its being universally admitted, that every railroad company in the United States is subject to have its charges regulated and fixed by statute-law. So far from any mischief resulting from this acknowledgment by all, that this is the law, I do believe, that much good would result and especially would good result to the railroad companies. For so long as they insist in fixing their rates of charge according to their own pleasure in defiance of statute-law, so long will bitter prejudices be stirred up, and injustice and wrong will be done to them by a public, who but for this unwarrantable claim would regard the companies with favor as general benefactors.

So far I have considered the question involved in this case without reference to any provisions in the Constitution of the United States. There is no provision in that constitution or in the constitution of our State, which in any manner affects the questions I have been discussing. In *Munn* v. *Illinois* it was claimed, that this fixing by the legislature of the charges made by private persons for the use of their property, which they had devoted to a use, in which the public had an interest, was a violation of the Fourteenth Amendment of the Constitution of the United States. But the court decided otherwise for reasons, which seem to me to be entirely satisfactory. The court says on page 123, that the laws of Illinois fixing the maximum of charges for the storage of grain in warehouses at Chicago is not repugnant as claimed to that part of the Fourteenth Amendment of the Constitution of the United States, which ordains that no State shall "deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction the equal protection of the law."

On this subject Chief Justice Waite in delivering the

opinion of the court says : " Every statute is presumed to be constitutional. The courts ought not to declare one to be unconstitutional, unless it is clearly so. If there is a doubt, the expressed will of the legislature should be sustained. The Constitution contains no definition of the word ' deprive' as used in the fourteenth amendment. To determine its signification, therefore, it is necessary to ascertain the effect which usage has given it, when employed in the same or like connection. While this provision of the amendment is new in the Constitution of the United States, it is old as a principle of civilized government. It is found in the Magna Charta, and in substance, if not in form, in nearly or quite all the constitutions that have been from time to time adopted by the several States of the Union."

By the fifth amendment it was introduced into the Constitution of the United States as a limitation upon the powers of the national government, and by the fourteenth as a guaranty against any encroachment upon an acknowledged right of citizenship by the legislatures of the States. When one becomes a member of society, he necessarily parts with some rights or privileges, which as an individual not affected by his relation to others he might retain. A body politic as aptly defined in the preamble of the constitution of Massachusetts, ' is a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good.' This does not confer power upon the whole people to control rights which are purely and exclusively private, *Thorpe* v. *R. & B. Railroad Company*, 27 Vt. 143 ; but it does authorize the establishment of laws requiring each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure others. This is the very essence of government, and has found expression in the maxim *sic utere tuo non alienum lœdas.* From this source come the police-powers, which, as was said by Mr. Chief Justice Taney in the *license cases*, 5 How. 583, 'are nothing more nor less than the powers of government inherent in every sovereignty   *   *   *   that is to say   *   *   *   the power to govern men and things.' Under these powers the government regulates the conduct of its citizens one toward another, and the manner each shall

use his own property, when such regulations become necessary for the public good. In their exercise it has become customary in England from time immemorial, and in this country from its first organization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, &c., and in so doing to fix a maximum of charges to be made for services rendered, accommodations furnished, and articles sold.

"To this day statutes are found in many States upon some or all of these subjects; and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property. With the fifth amendment in force Congress in 1820 conferred powers upon the city of Washington ' to regulate　*　*　*　*　the rates of wharfage at private wharves,　*　*　*　*　the sweeping of chimneys, and to fix the rate of fees therefor　*　*　*　*　and the weight and quality of bread,' 3 stat. 587, sec. 7, and in 1848 ' to make all necessary regulations respecting hackney carriages and the rates of fare of the same, and the rates of hauling by cartmen, wagoners, carmen, and draymen, and the rates of commissioners, of auctioneers, *Id.* 724 sec. 2. From this it is apparent that, down to the time of the adoption of the Fourteenth Amendment, it was not supposed that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property without due process of law. Under some circumstances they may, but not all. The amendment does not change the law in this particular, but simply prevents States from doing that which will operate as such deprivation."

The Chief Justice then at length proceeds to inquire into the principles, upon which such power of regulation rests, and to determine what is within and what without its operative effect. The conclusion he reaches is, that " when the owner of property devotes it to a use in which the public has an interest, he in effect grants to the public an interest in such use and must to the extent of that interest, submit to be controlled by the public for the common good." This conclusion is reached by the reasoning and on the authorities I have before cited in reaching the same conclusion. In fact

my reasoning as well as my authorities to uphold this conclusion is to a very great extent but a conclusion of his. Under this case it must follow, that the public has a right to control the charges of common carriers; for unquestionably they have devoted their property to a use, in which the public has an interest, as has been universally admitted; and this right of the legislature to fix the charges of common carriers is in no manner affected by the Fourteenth Amendment of the Constitution of the United States. Of course it must follow that the legislatures have a right to fix the charges of railroad companies; and that this right is in no manner affected by the Fourteenth Amendment of the Constitution of the United States. Railroad companies are but common carriers and like all other common carriers can have their charges regulated by the legislature from time to time; and this right to so regulate their charges is in no manner affected by the Fourteenth Amendment of the Constitution. This was decided in the Granger cases before referred to.

In the last of these cases, *Stone* v. *Wisconsin*, 94 U. S. R. p. 185, Justice Field in his dissenting opinion says: "The charter of a corporation being a contract, a sufficient consideration for the privileges and franchises conferred being found in the duties and liabilities aforesaid by the corporators, the subsequent power of the legislature is restrained by its terms. This has been so often judicially declared, that it has been supposed to be no longer open to discussion. The first question, therefore, for consideration in all cases where legislation affects the constitution of a corporation or its beneficial operation, is, what is the true construction of its charter, and, consequently, what privileges does it confer and what restraint does it impose upon legislative interference ? The rights and privileges implied in the contract are equally inviolable as those expressed."

This is unquestionably true when applied to a strictly private corporation. The charter of such private corporation is almost universally admitted to be a contract; and the legislature cannot without the consent of such private corporation alter its charter in a material respect, for such act would impair the obligations of such charter, which is a contract, and would therefore be unconstitutional and void. This was

decided in *Dartmouth College* v. *Woodward*, 4 Wheat 518; and it has been ever since admitted to be law by nearly all courts. But it is just as universally admitted, that the charter of a public corporation is not a contract and may therefore, without the consent of the corporation be changed by acts of the legislature in any manner the legislature may please. No one for instance ever doubted, that the charter of a town could be changed by the legislature in any respect without the consent of the town and against its protest. Justice Field therefore in the quotation, which I have given from his opinion, lays down the law too broadly, it not being true, as he would of course admit, that the charters of all corporations are contracts and not subject to legislative interference.

As I understand these Granger cases, the Supreme Court of the United States in them decided, that the charters of corporations, which provided for devoting their property to a use, in which the public has an interest, or, as I have called them, *quasi* public corporations, can not impose a restraint on a future legislature in fixing at its pleasure the charges to be made by such *quasi* public corporation for this use of their property; for they have in effect granted to the public an interest in such use of their property and must to the extent of that interest submit, as must a private person in the same circumstances, to be controlled by the public for the common good.

These Granger cases also decided, that railroad companies being *quasi* public corporations, are common carriers, and that the legislature had a right to fix their charges or rates of toll from time to time, just as it had a right to fix from time to time the charges of private persons who are common carriers. Of course this right on the part of the legislature so to fix from time to time the maximum rates, which railroad companies can charge for the transportation of persons and freight, is necessarily a denial that a railroad company's charter or the charter of a corporation can be a contract, so far as it attempts to fix permanently the maximum charges, which the company may make for the transportation of passengers and freight, or so far as it gives to such company a right to fix its charges, as it pleases, or to fix them at reasonable rates. In this respect the railroad charter is not like

the charter of a strictly private company, but it is like a charter of a public corporation.

To appreciate fully the true character and scope of the decision of the Supreme Court of the United States I will quote at some length from the opinion of the Supreme Court of Wisconsin pronounced by C. J. Ryan in *Attorney General* v. *Railroad Companies* pronounced at the June term, 1874, a little over two years before the decision of the Granger cases. Sec. 35 Wisconsin R. p. 563; he says :

"As early as 1810 the Supreme Court of the United States held, that an act of the State legislature might be a contract within the meaning of the prohibition (no State shall pass a law impairing the obligation of contracts), and therefore such act might be beyond subsequent legislative control. *Fletcher* v. *Peck*, 6 Cranch 87. In 1819 the same great tribunal held, that the charter of any corporation not municipal was a contract within the prohibition, which the legislature could not impair by subsequent amendments against the will of the corporation, *Dartmouth College* v. *Woodward*, 4 Wheaton 518. And that remains the law of the land to this day (1874). It is easy to criticise this decision; to say the very point was not in the case; to impeach the reasoning of the opinions. Many able jurists and statesmen have done so and are doing so. It is easy to foretell the case will be opened. Many do so. Here is one of the latest and most thoughtful of such speculations :

" 'Some of those, who think it would have been better, had the case been decided the other way, may reasonably condemn any attempt to unsettle a branch of the law so long established. But the murmuring at the whole doctrine, which is beginning to be heard throughout the country, the restless, fitful desire to get rid of it, not yet fully understood by themselves, which large classes of people begin to feel, indicate that the whole subject must, at no distant day, be carefully re-examined. Any decision in an ordinary case ought as a rule to stand; and when a decision has stood for fifty years even to question it lightly and without sufficient consideration, is injurious and censurable, as tending to unsettle an entire system of jurisprudence. But constitutional decisions which take from the political department of government powers

and prerogatives usually belonging to it, and which legislation can not remedy, stand on a different footing from ordinary precedents involving questions of private rights.   Fifty years is a short period in the history of a nation living under a constitution intended to be perpetual.   The consequences of the Dartmouth College case are now beginning ing to press heavily on great communities, and the pressure we believe will increase rather than diminish.   It involves questions of political power, political necessity, it may be of political safety, and the case will not be let alone, however wise it might be to do so.   8 American Law Review 191.'"

"The court was not unanimous in the Dartmouth College case, and has not always been unanimous in subsequent cases applying the rule.   Indeed it is a constant traditon of the profession, that the bench has never since been unanimous on the full extent of the doctrine in that case.   *   *   *   Chief Justice Marshall in this case says,   *   *   *   'That the framers of the constitution did not intend to restrain the States in the regulation of their civil institutions adopted for internal government, and that the instrument they have given us is not to be so construed, may be admitted.   The provision of the constitution has never been understood to embrace other contracts than those which respect property or some object of value, and confer rights which may be asserted in a court of justice.'"

"If property, as the great Chief Justice indicates, be the test, it might well be said that aggregations of persons in municipal corporations may have rights of property as clearly as aggregations of persons in private corporations and come as well within the prohibition.   So the court afterwards found in *East Hartford* v. *Hartford Bridge Co.*, 10 Howard 511, and other cases in which the court disregarded the property test, and rested the application of the rule on the distinction between public and private corporations.   See *Charles River Bridge* v. *Warren Bridge*, 11 Peters 420.   And so of offices it might well be suggested, that the emoluments of public office conferring rights, which may be asserted in a court of justice, might logically come within the property test.   *   *   *   It is difficult at this day to recognize the sound policy of this strict distinction between municipal and

all classes of _quasi_ private (it would have been more proper to have said _quasi_ public) corporations, or to appreciate the wisdom which admits the necessity of legislative control over all municipal corporations of every grade and nature, and denies it over all other corporations of every grade and nature. It is quite safe to say that in the State of Wisconsin, each of these defendants—a private corporation for the purposes of this rule and placed by it above legislative control of its franchises—directly exercises, to say nothing of its indirect influence, more power over the public welfare and prosperity of the State, over the commonwealth, than the largest municipality in the State with its 90,000 or 100,000 souls. The State entrusts it with the exercise of the sovereign right of eminent domain, with the construction and operation for public purposes of hundreds of miles of public thoroughfare of the most dangerous character to public safety, with a virtual monopoly within its district of the carrying trade, with almost a control of commerce within its reach, and a power of almost life and death over its people— yet it is a private corporation whose charter the legislature cannot control; while the most insignificant town in the State, with no extra-territorial influence and hardly an extra-territorial recognition is invested with the dignity of a public corporation, over which it is unsafe to deny legislative control.

"It is not to be overlooked that the decision was made long before the era of great corporations in this country; long before what was then private corporations had become of more public significance than municipal corporations were then, and before our present civilization hinged almost as much on the _quasi_ private [he should more probably have said _quasi_ public] corporations as Hallam says early modern civilization did on municipal corporations. * * The difficulty arises probably from applying old names to new things; applying the ancient definition of present corporations to corporations of a character unknown when the definition arose corporations of such great and various public relation and public significance; a definition which, as applied to them is wearing out, so that courts are beginning to call them _quasi_ private corporations and _quasi_ public corporations, as in truth they are."

"The remarks since made, from time to time on this decision by the court which made and has hitherto sustained it, are perhaps the severest commentary upon it, in the broad sense in which it is applied.    It deprives the States of a large measure of *their* sovereign prerogative, and establishes great corporations as independent powers within the States, a sort of *imperia in imperio*, baffling State order, State economy, State policy.    Well might a distinguished judge of the same great court, when the extent of the evil was becoming apparent, start back, shocked at the claims of corporate immunity from law and cry out:

" ' No State it is declared shall pass a law impairing the obligation of contracts; yet with this concession constantly yielded, it cannot be disputed that in every political sovereign community there inheres necessarily the right and duty of guarding its own existence, and of protecting and promoting the interest and welfare of the community at large.    This power and this duty are to be exerted not only in the highest acts of sovereignty and in the eternal relations of government; they reach and comprehend likewise the interior polity and relations of life which should be regulated with reference to the advantage of the whole society.'    And he adds speaking of the right of eminent domain :  ' It would imply an incredible fatuity in the States to ascribe to them the intention to relinquish the power of self-government and self-preservation,' *West River Bridge Company* v. *Dix*, 6 How. 507.

"It was lately said by the same court, speaking of this instruction and application of this constitutional prohibition : ' a departure from it *now* would involve damage to society that cannot be foreseen ; would shock the sense of justice of the country, unhinge its business interests, and weaken if not destroy, that respect which has always been felt for the judicial department of the government.'    *Binghamton Bridge*, 3 Wallace 51.    Perhaps so; there is always inconvenience and sometimes danger in abandoning old rules of judicial decisions.    But there is danger in adhering to this rule.    And it is not always the better part of wisdom to bear the ills we have, than to fly to others we know not of.    And it must be conceded that the language of the court, just quoted sounds rather like an apology than justification."

Be all this as it may, the rule in *Dartmouth College* v. *Woodward* stands and we must yield to it while it does stand.   Neither this nor any State court can disregard or evade it, while the court which established it may see fit to adhere to it. And the rule that corporate charters are contracts, has been expressly applied by that court to railroad charters.   *Wilmington Railroad* v. *Reid*, 13 Wallace 264; *Humphrey* v. *Pegues*, 16 Wallace 244."

I have quoted thus largely from the opinion of the learned Chief Justice because of the conservative character of the views of the court.   While finding great fault with the principles laid down in *Dartmouth College* v. *Woodward*, it admits that the rule laid down in it still stands in 1874, and that it ought not to be disregarded or evaded by the State courts, till it was modified or abolished by the Supreme Court of the United States, by whom it was established.   But it predicts that the time had nearly arrived, when this must be done. This prediction was fulfilled within about two years thereafter in the celebrated Granger cases.   More extreme views in opposition to the rule laid down in *Dartmouth College* v. *Woodward* have been expressed.   See *Deboit* v. *The Ohio Life Insurance and Trust Company*, 1 Ohio State Reports 563; 8 American Law Review, January, 1874, p. 189, and Shirley on the Dartmouth College causes; and *The Bank of Toledo* v. *The City of Toledo and John R. Bond*, 1 Ohio State Reports 622, in which the rule laid down in *Dartmouth College* v. *Woodward* is directly overruled, and the following propositions are decided to be law :

"The charter of a private corporation is in form and in its inherent terms and nature a law, and does not possess the essential elements of a contract, to-wit: Two competent contracting parties, a proper subject-matter, a legal consideration, and a mutuality of obligation ; and, therefore, does not come within the purview and true intent of the clause of the Constitution of the United States, which prohibits a State from passing any law impairing the obligation of a contract. The doctrine, that the charter of a private corporation is in and of itself a contract between the State and the corporation or corporators, which has taken its origin from and is founded upon the decision of the Supreme Court of the Uni-

ted States in the case of the *Dartmouth College* v. *Woodward*, 4 Wheaton 518, does not appear in the report of that case to have had the sanction of a majority of the court; Chief Justice Marshall who delivered the opinion of the court placing the decision upon the ground, not that the charter granted by the crown of England (which by its own inherent terms, was undeniably subject to legislative control), was in and of itself a contract; but that ' *the circumstances of the case*' disclosed the existence of a contract for the creation of a trust, and that the investment of private property, consisting of money and lands, for the purposes of education under the authority of the charter, the terms and obligations of which contract were interferred with and impaired by the State law, which was declared unconstitutional. The legislative power includes as well the power to amend and repeal existing laws as the power to enact laws. And the legislature is incompetent to make any contract or arrangement whereby the legislative power can be, to any extent, surrendered or abridged."

Until a comparatively recent period corporations aggregate were divided by text-writers as well as by judges into but two classes, private corporations created for private purposes as distinguished from govermental purposes and public corporations created for public purposes exclusively. This division really included almost all corporations, which had any actual existence until a comparatively recent period. Sixty yeare ago there were actually in existence scarcely any of the corporations, which I have called *quasi* public corporations; and therefore it is not strange, that text-writers and judges spoke of corporations being divided into but two classes private and public corporations.

This was the state of things, when in 1819 the Supreme Court of the United States decided the case of *Dartmouth College* v. *Woodward*, in which, as it is generally understood, it was decided or at least held by the court, that the legislature of a State can not impair or essentially alter the charter of a private corporation without the consent of the corporators, as it was to be regarded as in the nature of a contract. There were then no railroad companies in existence. After they had first come into existence, some ten years after this decision, the courts as well as text-writers took for granted,

that railroad companies were private corporations. They were clearly not public corporations within the definition, which had been given of public corporations, and as all corporations, which were not public, had always been classed as private corporations, the courts and text-writers naturally regarded railroad companies as private corporations and took it for granted, that like other private corporations their charters could not be impaired in any respect or essentially altered without the consent of the corporators. In most cases this was taken for granted without any argument or consideration whatever; but in other cases this was held after more or less consideration. The cases are numerous, in which this has been taken for granted or held. See *Donnaber* v. *State of Mississippi*, 8 Smead & M. 649-661; *Trustees of the Presbyterian Society of Waterloo* v. *Auburn and Rochester Railroad*; *Dartmouth College* v. *Woodward*, 1 N. H. 111-116; *Eustise* v. *Parker*, 1 N. H. 273; *Dearborne* v. *Boston C. and Montreal Railway Co.*, 4 Foster (24 N. H.) 179-180; *Ohio &c. Railroad Co.* v. *Ridge*, 5 Blachf. 78; *Bonaparte* v. *Camden and Amboy Railway*, 1 Baldwin C. C. 205-222; *Rendle* v. *Delaware and Raritan Canal Co.*, 1 Wallace Jr. 375; *R. and G. Railway* v. *Davis*, 2 Dev. & Batt. (Law R.) 451; *Thrope* v. *R. B. & R.* 27 Vt. 140; *Sweatt* v. *Boston H. and E. Railway Co.*, 3 Clifford 339; *Boston and Lowell Railway Co.* v. *Salem Railway Co.*, 2 Gray 1; *Philadelphia, Wilmington and Baltimore Railroad Co.* v. *Bowers*, 4 Houston (Del.) 506.

In very few cases has the question before the court been, whether the legislature could reduce the maximum charges, which a railroad company could make as fixed by its charter. This has been an inference rather drawn from the fact, that railroad companies were regarded as private corporations, whose charters it had been held were contracts. But the railroads in this country have increased in number and importance so enormously in the last twenty years, that they now possess a vast capital and have engrossed almost the entire trafic and travel of the country. Their power and functions have thus come in daily contact with the material interests of almost every citizen of this great country. These things have recently attracted the attention of the courts and

have demonstrated to many of them the importance nay almost absolute necessity of railroad companies being subjected to a wise and just supervision and control by the legislature, especially with reference to their charges for the transportation of passsengers and freight  Thus the courts have been forced to consider, whether there was not a fatal defect in the law, if it was true, as had been generally taken for granted, that there was no difference, so far as the control of them by the legislature was concerned, between a railroad company and the most insignificant private corporation; whether it could be true, that the charter of a railroad company and the charter of a private company incorporated to manufacture combs were both to be regarded as purely private corporations, and that the legislature had no more right to regulate the charges made by a railroad company than they had to fix the charges made by such a manufacturing company for its combs.   They called to mind the fact, that common carriers never did have a right to charge what they pleased for the transportation of passengers and freight, but that they were in this respect always subject to the control of the courts or of the legislature, while the manufacturer of combs by the common law always had a right to charge what he pleased for his combs.

Some of the courts as far back as 1853 assailed the rule, which had been deduced from the case of *Dartmouth College* v. *Woodward*, that the charter of a private corporation was a contract, and nothing in it could be materially altered by any act of the legislature without the consent of the corporators. (*Bank of Toledo* v. *The City of Toledo and J. R. Bond*, 1 Ohio 622.)   Others not disputing this rule questioned, whether railroad companies should be regarded as private corporations, and ought not rather to be regarded as public corporations though not coming within the old definition of public corporations, or if not so regarded whether they ought not to be regarded as *quasi* public corporations, whose charters were not to be regarded as contracts beyond the control of the legislature, they not being purely private corporations; and whether the rule to be fairly deduced from the case of *Dartmouth College* v. *Woodward*, 4 Wheat. 518, was not confined to strictly private corporations, as was Dartmouth Col-

lcge. But the difference between a railroad charter and the charter of a manufacturing company was undefined and vague, as may be seen from the quotations made from the opinion of the court in *Attorney General* v. *Railroad Companies*, 35 Wis. 563.

This was the condition of matters, when the Granger cases were decided in 1876 by the Supreme Court of the United States. The court in these cases did not settle all these controversies and disputes. It did not decide, that the charters of strictly private corporations were not to be regarded as contracts beyond the control of the legislature, or that they were. Nor did it even decide, that the charters of railroad companies and other *quasi* public corporations could in no respect be regarded as contracts beyond the control of the legislature. But, as we have said, they did decide, that railroad companies and all other *quasi* public corporations despite any provisions in their charters could have their charges for the use by the public of their property, as the charges of railroad companies for the transportation of passengers and freight, changed and controlled by future legislative acts. As I understand these decisions, while they do not accurately define the extent of the control of the legislature over the charters of railroad companies and *quasi* public corporations, yet they do in effect decide, that the legislature may control in all respects such *quasi* public corporations to the full extent, to which the legislature could control a private person engaged in the same kind of business. This principle, when applied to railroad companies, would give to the legislature despite any provisions or stipulations in the charters of such companies the right not only to control their charges but also to control them to the full extent, that the corporation could control the business of a private person as a common carrier. In these cases Chief Justice Waite in 94 U. S. 161, uses this language :

" The Burlington and Missouri Railroad Company was organized under the general corporation laws of Iowa, with power to contract with reference to its business, the same as private individuals, and to establish by-laws and make all rules and regulations deemed expedient in relation to its affairs, but being subject nevertheless at all times to such rules

and regulations as the general Assembly of Iowa might from time to time enact and provide. This is the substance of its charter and to that extent it is protected as by a contract. Whatever is granted is secured subject to the limitations and reservations in the charter or in the laws or constitutions which govern it. The company in the transaction of its business has the same rights and is subject to the same control, as private individuals under the same circumstances. It must carry when called upon to do so and can charge only a reasonable sum for the carriage. In the absence of any legislative regulations upon the subject, the courts must decide for it, as they do for private persons when controversies arise, what is reasonable. But when the legislature steps in and makes a maximum of charges, it operates upon the corporation the same as it does upon individuals engaged in a similar business. It is within the power of the company to call upon the legislature to fix permanently this limit and make it a part of the charter, and if it was refused, to abstain from building the road and establishing the contemplated business. If that had been done the charter might have presented a contract against future legislative interference. But it was not; and the company invested its capital, relying upon the good faith of the people and the wisdom and impartiality of the legislature for protection against wrong under the form of legislative regulation."

There is in this quotation one *obiter dictum*, which is not only inconsistent with the other Granger cases but actually inconsistent with the decision rendered by the court in this case, and in which the Chief Justice concurred. I refer to these words : " It was within the power of the company to call upon the legislature to fix permanently the limit and make it a part of the charter. If that had been done, the charter might have presented a contract against future legislative interference." If the provisions in the charter giving the company power " to contract with reference to its business the same as private individuals " did not constitute the charter a contract against future legislative interference in fixing the rates of charges, to which the company must conform, I can not see how it is possible, that the fixing of the rate of charges in the charter would constitute the charter a contract against fu-

ture legislative interference as to the rates of charges. The conferring of the right to make contracts the same as natural persons was certainly a contract by the legislature, just as much as it would be a contract, had the charter said the company might charge a certain named rate. In neither case would the railroad charter be a contract in this respect, because engaging in a business, whereby they agreed to devote their property to a use, in which the public had an interest, as decided in *Munn* v. *Illinois*, 94 U. S. page 113, sec. 4 : "they in effect gave to the public an interest in such use and must to the extent of that interest submit to be controlled by the public for the common good." In other words they agreed, that the public by the legislature might fix the price from time to time to be paid for the use of their property. If the price was fixed in the charter for such use, it could be afterwards changed by the legislature at its pleasure, just as the legislature, though no price was fixed in the charter, and the company by it was entirely unrestricted as to the price it might charge for the use of its property, could as decided by these Granger cases subsequently fix the price to be charged, and change it from time to time as might seem by it to be required by the public good.

This necessarily results, because it is always agreed tacitly by every common carrier whether a private person or a railroad company, when he engages in that business, that the legislature may from time to time, as it pleases, fix the charges for the transportation of passengers or freight. If a price, which may be charged for such service, is named in the charter, it is but a legislative fixing of the charge for the time being, and it may be changed from time to time ; and even if there was inserted in the charter a provision, that the price fixed in the charter should never be altered by the legislature, that would not alter the case, for by the decisions of the court in the Granger cases the common carrier, as soon as he engages in this business, whether he be a private person or a railroad company, agrees that his charges for the use of his property may be controlled by the public through the legislature at its pleasure ; and this agreement or understanding must necessarily make any stipulation in the charter, that the charges of the company shall never be changed, a mere nullity.

I conclude therefore that this doctrine of Chief Justice Waite is necessarily inconsistent with the decision of the court in the Granger cases. But upon whatever ground it be based, these Granger cases do decide, that the legislature may at its pleasure control the charges of railroad companies for the transportation of passengers and freight despite any provisions, which may be in the charter of the companies on the subject, such provisions not being in the nature of a contract, the impairing of the obligations of which is forbidden to any State by the Constitution of the United States. Perhaps the true ground, upon which the conclusions reached in the Granger cases may be and perhaps will be ultimately based, is the principle of law stated by Judge Cooley in his work on Constitutional Limitations. p. 283 :

"It would seem to be the prevailing opinion, and one based upon sound reason, that the State could not barter away, or in any manner abridge or weaken, any of the essential powers which are inherent in all governments, and the existence of which in full vigor is important to the well being of organized society; and that any contracts to that end being without authority cannot be enforced under the provisions of the national constitution forbidding the States to pass laws impairing the obligation of contracts."

The Supreme Court of the United States has since then, in 1879, upon this express ground held, that by an amendment of the constitution of a State a charter strictly private in its character may be entirely modified and destroyed, though the company, when it obtained its charter granting it the right to carry on its business for twenty years, paid to the State a monied consideration for this privilege. The case to which I refer is *Stone* v. *Mississippi*, 101 U. S. 814. The facts were as follows: "The legislature of Mississippi on February 16, 1867, passed an act incorporating the Mississippi Agricultural and Manufacturing Aid Society, giving to this company a right to draw a lottery from time to time for a period twenty-five years; and for these privileges the company was to pay to the State $5,000.00 in cash and $1,000.00 per year for twenty-five years, and one-half per cent. on all the lottery tickets it sold, which consideration was accordingly paid. In less than two years thereafter a new constitution was

adopted by Mississippi, which provided that no lottery there-tofore authorized should be permitted to be drawn; and the legislature carrying out this provision of the constitution on June 10, 1870, passed an act forbidding the drawing of any lottery in that State.    The Supreme Court held that this constitutional provision and act did not violate the provision in the Constitution of the United States prohibiting a State from " passing laws impairing the obligation of contracts."    The court says:

" It is now too late to contend, that any contract, which a State actually enters into when granting a charter to a private corporation, is not within the protection of the clause in the Constitution of the United States that prohibits States from passing laws impairing the obligation of contracts. Art. I, sec. 10.    The doctrines of trustees of *Dartmouth College* v. *Woodward*, 4 Wheat. 518, announced by this court more than sixty years ago have been so imbeded in the jurisprudence of the United States as to make them to all intents and purposes a part of the Constitution itself."    The court after stating that there was no doubt that the legislature intended to make a contract by these provisions of the charter of this company, then proceeds thus: " Whether the alleged contract exists, therefore, depends on the authority of the legislature to bind the State and the people of the State in that way.  All agree that the legislature can not bargain away the police-power of the State.  'Irrevocable grants of property and franchises may be made if they do not impair the supreme authority to make laws for the right government of the State; but no legislature can curtail the power of its successor to make such laws, as they may deem proper in matters of police.'  *Metropolitan Board of Excise* v. *Barne*, 34 N. Y. 657 ; *Boyd* v. *Alabama*, 94 U. S. 645.    *    *    *    *    But the power of governing is a trust committed by the people to the government, no part of which can be granted away. The people in their sovereign capacity have established their agencies for the preservation of the public health and public morals and the protection of public and private rights.    These several agencies can govern according to their discretion, if within the scope of their general authority, while in power ; but they can not give away or sell the discretion of those who

are to come after them, in respect to matters, the government of which from the very nature of things must ' vary with the circumstances.' ".

The rest of the opinion is devoted to showing that the allowing or prohibiting lotteries is a matter of police and therefore must always be under the control of the legislature. The opinion concludes: "Certainly the right to suppress lotteries is governmental, to be exercised at all times by those in power at their discretion.    Any one therefore who accepts a lottery-charter, does so with the implied understanding that the people in their sovereign capacity, and through their proper constituted agencies, may resume it at any time when the public good shall require whether it be paid for or not.    All that one can get by such a charter is a suspension of certain governmental rights in his favor, subject to withdrawal at will.    He has in legal effect nothing more than a license to enjoy the privilege on the terms named for the specified time, unless it be sooner abrogated by the sovereign power of the State.    It is a permit good as against existing laws but subject to future legislation and constitutional control or withdrawal."

Now it does seem to me, that the right to fix and regulate the charges of all common carriers including of course railroad companies is clearly a governmental power, a matter of internal police.    It has always been so considered, and where not exercised by the legislature has been left to the courts, and never was left to the common carriers.    It is obvious, that the charge for the transportation of passengers or of freights, to use the language of the Supreme Court, "is a matter, the government of which from the very nature of things must vary with varying circumstances;" and the regulations of such charges from time to time is, to use again the language of the Supreme Court, "for the protection of public and private rights;" and therefore, to use the language of the supreme court again, "the legislature cannot give away or sell the discretion of their successors in respect to matter, the government of which from the very nature of things must vary with varying circumstances."    It would seem therefore to follow, that a provision in a railroad-charter fixing a maximum charge for the transportation of passen-

gers or freight is in legal effect nothing more than a license, which may at any time be changed by the sovereign power of the State, that is, by legislative enactment.

The framers of the constitution of our State evidently regarded this fixing of maximum rates for charges for the transportation of passengers and freights by railroad companies as governmental in its character and therefore under this decision of the Supreme Court of the United States incapable of being surrendered to any corporation either by gift or sale.. Our Constitution of 1872, Article XI Section 9, provides : " The legislature shall from time to time pass laws applicable to all railroad corporations in the State establishing reasonable maximum rates of charges for the transportation of passengers and freights, and providing for the correction of abuses, the prevention of unjust discriminations between through and local or way freight and passenger tariffs and the protection of the just rights of the public, and shall enforce such laws by adequate penalties." The right of our constitutional convention to insert this clause in our Constitution, and the right and duty of the legislature to carry out this provision of the constitution is for the reasons, which have been stated, clear to my mind, though the legislature should in so doing violate, set aside and disregard provisions in the charters of railroad companies, which were in existence, when this constitution was adopted ; for all such provisions in the charters of these existing railroad companies must be regarded as mere licenses liable to be revoked at the pleasure of the legislature, and not as contracts protected by the clause of the Constitution of the United States, that prohibits States from passing laws impairing the obligations of contracts.

Pursuant to this provision of our comstitution the legislature on December 27, 1873, passed "*An act to establish a reasonable maximum rate of charges for the transportation of passengers and freight and to prevent unjust discriminations and extortions in the rates to be charged by different railroads in this State for the transportation of passengers and freight on said roads.*" This act took effect April 1, 1874, and is in my judgment binding on all the railroads in the State, whether they obtained their charters before or since the

passage of this act, and without regard to the fact, that some railroad companies, chartered before this act was passed, were allowed by their charters to charge higher rates than are prescribed by this act.

The question we have discussed is of the greatest importance to the people of this State and indeed to the people of the whole country.   This is shown by the great consideration, which has been given to it, whenever it has been fully and fairly presented to the courts for their determination.   This is evinced by the great space, which the reports show, that such cases have occupied in our books of reported decisions The case of *Toledo Bank* v. *Bond*, 1 Ohio St. 622, occupies 81 pages; *Attorney General* v. *Railroad Companies*, 35 Wis. 425, no less than 183 pages; and the Granger cases including *Munn* v. *Illinois*, on which they were based in all 94 pages.   The great importance of the question, which we have discussed, would have induced us to omit its discussion in this case, could we have decided this case without the discusion and decision of this important question; but, as will hereafter appear, this could not be done, the decision of this point being necessary to the decision of this case.

In this case it appears from the facts agreed, that the Laurel Fork and Sand Hill Railroad Company was chartered by the act of February 28, 1866. (Acts of 1866, p. 112.)   The following provisions are found in this charter:

"8. The said company shall have full power to regulate their charges for the transportation of persons and produce or other articles, provided their charges for transporting oil shall in no case exceed the sum of seventy-five cents per barrel and of persons and of merchandise other than oil, not more than three times as much as allowed in the Code of Virginia chapter 61 section 19.

"9. The company shall be subject to the provisions and liabilities and entitled to the benefits of the Code of Virginia second edition prescribing general regulations for the incorporation of railroad companies especially such as are specified in chapter 56, 57 and 61 thereof, and of all other general laws now in force relating to railroad companies, except so far as the provisions of this act are or may be inconsistent therewith.

"10. So much and such parts of the Code of Virginia, hereinbefore recited, or any act or acts which may be inconsistent with any of the provisions of this act, shall be held not to apply to the company hereby incorporated as far as the same may effect the charter granted by this act.

"11. The legislature reserves the right to alter, amend or repeal this act."

In pursuance of this reserved right the legislature on February 21, 1868, amended this act granting to this company a right to extend its road, increasing its capital stock, providing how the company should be governed in making sidings and extensions; and the last clause in this amended act was as follows:

"4. The legislature reserves the right to add, to alter or repeal the powers and priviledges herein granted; but such additional alteration or repeal shall not effect or impair the right of creditors of the corporation to have the property and assets thereof applied in discharge of their respective claims, or the stockholders to have the surplus which may remain after having provided for the debts and liabilities of the corporation distributed among themselves according to their respective interests."

The legislature never exercised the reserved right to add to, alter or repeal the powers and privileges granted by this last act.

The following are provisions found in the Code of Virginia, second edition, referred to in section 9 of the original charter above copied, which declared, that "the said company should be subject to all the provisions and liabilities and entitled to all the benefits of this Code." They are found in chapter 61, page 363 of the Code of Virginia of 1860:

" 42. The charter of every company which is governed by the act passed on March 11, 1837, prescribing certain general regulations for the incorporation of railroad companies, and of every company hereafter incorporated, which shall be governed by this chapter,. may be altered or modified by any future legislature, as may seem to it proper, except that no law shall be passed for taking from a company its works or property without making to it just compensation, or for

changing its tolls without its assent in any other cases than such as are specially provided for in this chapter.

" 43. When the net profits of any company which is governed by the twenty-sixth section of the said act passed on March 11, 1837, shall amount to a sum equal to the capital stock, with six *per centum per annum* interest thereon, its tolls may be fixed and regulated as prescribed by that section.

"44. When the net profits of any company hereafter incorporated, which may be governed by this chapter, shall be such that, but for this section, dividends might be declared out of the said profits exceeding the rate of fifteen *per centum per annum* on the capital stock invested, laws may be passed for reducing the tolls of the company. But no law shall reduce the tolls so as to prevent dividends of fifteen *per centum per annum*, within thirty years from the time the first dividend of profits of the said company was declared, or so as to prevent dividends of twelve *per centum per annum* after the said thirty years and before fifty years from the same time, or so as to prevent dividends of ten *per centum per annum* after the said fifty years.

" 45. In the case of any company hereafter incorporated, which may be governed by this chapter, if, after thirty years from the time the first dividends of profits of such company was declared, the State chooses, it may have the works and all the property, rights and privileges of such company on paying therefor at the least the amount of capital paid in, and, over and beyond that, such sum as with the dividends which the stockholders may have received out of the profits of the company will give them on the capital paid in the following net profit from the time of payment thereof by the stockholders to the time the State makes such payment, to-wit: a net profit of fifteen *per centum per annum* to the expiration of the said thirty years; a net profit thereafter of twelve *per centum per annum* until the State makes such payment, if that be within fifty years from the said first dividend, and if it be not, then until the end of the said fifty years, and afterwards, a net profit of ten *per centum per annum* until the State makes such payment."

Under the agreed case set out in the statement of this case the first question to be determined is: Has the legislature of

West Virginia ever exercised the right reserved by it in the eleventh section of the original charter of the Laurel Fork and Sand Hill Railroad, Acts of 1866, page 114, and which has been copied above?    Has the legislature ever altered, amended or repealed the original charter of this company except by this act of February 21, 1868, page 30 of Acts 1868, which act in no manner affects the rights of either of the parties to this suit?    It is not pretended that this charter has ever been repealed either expressly or impliedly.    Has it been " altered or amended " by the legislature except by this act of 1868?    It is not claimed that this has been done, unless it was done by chapter 227 of Acts of 1872–3, p. 710.

This act divided all railroads in the State into four classes and limited the charges of each of these classes of railroads to certain fixed rates; and the rates fixed for the class of railroads, to which the Laurel Fork and Sand Hill Railroad belongs, both for the transportation of passengers and freight, including oil, was much less than the rates fixed by the charter of this company in section 8 above quoted.    (Acts of 1866, p. 114.)    It was a general act; and neither this railroad company nor its charter nor any other particular railroad company nor its charter was mentioned in this act.    Can this be held to be an amendment of the eighth section of the special act chartering this company found in the Acts of 1866, p. 114 ? The Constitution of West Virginia passed in 1872 provides, article VI., sec. 30 : (Acts of 1872–3, p. 16–17.) " No act shall be amended by reference to its title only; but the law or section amended shall be inserted at large in the new act." Now the act, to which we have reference, chapter 227, Acts of 1872–3, p. 710, neither recites the title of this act chartering this company nor inserts at large section 8 of chapter 113 of Acts of 1866, which, it is claimed, it amended.    But on the contrary it in no manner refers to this act or to the Laurel Fork and Sand Hill Railroad Company, being a general act applicable to every railroad in the State and passed in pursuance of section 9 of chapter XI. of this Constitution.

It is claimed however, that despite this constitutional provision this chapter 227 of Acts of 1872–3 should be regarded as an amendment of section 8 of chapter 113 of Acts of 1866; and *Anderson* v. *The Commonwealth*, 18 Grat. p. 295, is relied

upon as an authority to sustain the position. The same provision as article X., section 30 of our Constitution was in the Virginia Constitution; and the National Express Company had in its charter a provision like that found in the charter of the Laurel Fork and Sand Hill Railroad Company making the charter subject to modification or repeal at the pleasure of the legislature.

The act granting the charter of the National Express Company made no provision of any sort as to who should or what should be liable to the payment of the debts of the company, or who or what should be liable to the payment of the taxes assessed against the company. By the common law the property of the company alone was liable to be levied upon for taxes assessed against the company. But subsequently the legislature passed a general act in no manner referring to the act incorporating the National Express Company but providing, that certain taxes should be assessed on all savings banks, insurance-companies and express-companies; and the stockholders of every such company were made personally liable for the taxes assessed on such company. The court held, that by this general law "no section or provision of the act of incorporation was amended. A new provision was made imposing a liability, as to which the act was silent." The provision of the Virginia Constitution, the same as that of ours, as to the manner in which acts are to be amended was not violated. So in the case before us it must be held that the act of 1872–3, chapter 227 is not an amendment of section 8 of chapter 113 of Acts of 1866. But it does not therefore follow that this act, chapter 227 of Acts 1872–3, is either void or does not apply to the Laurel Fork and Sand Hill Railroad Company, just as it applies to every other railroad company in the State, and as the Virginia act making the stockholders of express-companies personally liable applied to the National Express Company as it did to every other express-company who was not protected from its operation by its charter.

The case before us differs too from the Virginia case in this important particular, that chapter 227 of Acts of 1872–3, does change the provision contained in section 8 of chapter 113 of Acts of 1866, and therefore, if it was an exercise of

a reserved right to amend this section, it could be done only in the mode prescribed by the constitution. In the Virginia case on the contrary no provision in the act incorporating the company was changed by the general act but only a common law rule, that only the property of an incorporation should be liable for the payment of its taxes. Chapter 227 of the Acts of 1872–3 is a valid act passed in pursuance of Section 9 of Article XI of our Constitution and in conflict with no provision of our Constitution, and, as we have seen, in conflict with no provision of the Constitution of the United States, even when applied to the Laurel Fork and Sand Hill Railroad Company, or to any other railroad company in this State, though chartered before the passage of this act or the passage of our Constitution, and though such railroad charter had in it provisions, which expressly authorized such company to charge higher rates than are prescribed in this chapter 227 of Acts of 1872–3, and though its charter expressly provided, that the legislature should not have the power to reduce the rates fixed in the charter. For such provisions do not partake of the nature of a contract; and the legislature has a right from time to time to alter, change or fix at its pleasure the charges made by a common carrier whether a railroad company or a private individual. And this governmental power can not be taken away from future legislatures by any legislature in granting a charter to any company. One legislature cannot thus give away or sell the discretion of a future legislature.

My conclusion is, that the legislature of the State, when it passed chapter 227 of Acts of 1872–3, did not exercise the right, which it reserved in the eleventh section of chapter 113 of Acts of 1866, which incorporated The Laurel Fork and Sand Hill Railroad Company, and therefore, so far as this case is concerned, this act of incorporation is to be regarded just as though this eleventh section had not been inserted in it. This being the case, there was an absolute necessity imposed on us to determine in this case the question, whether the legislature possessed the power to increase at its pleasure the charges of a railroad company, when its charter had fixed the rates, which it might charge; and hence we were compelled to consider the first proposition laid down in

this opinion, the consideration of which we would have avoided, if this case could otherwise have been decided.

The counsel for the defendant in error insists, that by the ninth section of its charter (see Acts of 1866 p. 114) sections 42, 43, 44, and 55 of chapter 61 of the Code of Virginia of 1860 were made a part of its charter, and that these sections, quoted above, when taken in connection with section 11 of its charter, which reserves the right to the legislature to alter or amend the charter, amount to a qualification of this right to alter or amend this charter so as not to interfere with the tolls, which the company had a right by it to charge, in any other case than those specially provided for in these sections; and that the case presented by the agreed facts shows, that under these sections the legislature had no right to amend the charter of this company so as to reduce the tolls, which by this charter it had a right to charge. This proposition is disputed by the counsel for the plaintiff in error. I deem it unnecessary to express any opinion on this subject. For, from what has been said, it is apparent, that even if the legislature in the charter of the Laurel Fork and Sand Hill Railroad had expressly stipulated, that it never would reduce the tolls, which the company was by its charter authorized to take, it could nevertheless have done so whenever it pleased; for such stipulation would not have been in the nature of a contract, and the legislature, which granted such charter, could not bind future legislatures not to exercise, as they pleased, their right to fix the tolls of this or any other railroad company, it being a common carrier, and the legislature having necessarily the power from time to time to fix the charges for transportation of all common carriers whether private persons or railroad companies.

The fourteenth section of the agreed case provides, " that if chapter 27 of the Acts of 1872–3 does legally and constitutionally modify the said charter of the plaintiff as to rates of toll, then the judgment will be for the defendant's offsets $2,000.94, (see eleventh section of agreed case) less the amount of the plaintiff's claim $1,070.75 due from the defendant under his covenant." In this agreement nothing is said about interest. The plaintiff's claim bore interest from June 1, 1872; and the defendant's offsets bore interest from dif-

ferent periods ranging from April 1, 1874, to November 30, 1874.   But as these offsets of the defendant considerably exceeded in amount the plaintiff's claim, I presume that the understanding of the parties was, that any interest due on the defendant's offsets should be regarded as balanced by the interest due on the plaintiff's claim.   This conclusion I reach, because nothing is said about interest in the fourteenth section; and in no part of the agreement is anything said about the time, from which the defendant's offsets, if allowed him, should bear interest.    By thus offsetting the interest, as the parties appear to have intended, the plaintiff will gain some advantage; but on this understanding of the agreement the defendant, upon the principles I have laid down, was entitled to recover the difference between the amount of his offsets and the amount of the plaintiff's claim that is $2,000.94 less $1,070.75 or the sum of $930.13, which should bear interest from the time judgment was rendered in the circuit court of Wood county, that is, from April 1, 1879.   But the plaintiff below ought clearly to recover of the defendant below its costs expended in the circuit court of Wood county as the offsets of the defendant arose after the institution of this suit by the plaintiff.

For these reasons the judgment of the circuit court of Wood county must be reversed; and the plaintiff in error must recover of the defendant in error its costs in this Court expended; and this Court proceeding to render such judgment, as the circuit court should have rendered, doth adjudge, that The West Virginia Transportation Company do recover of the Laurel Fork and Sand Hill Railroad Company the sum of $930.13 with interest thereon from April 1, 1879, and that the Laurel Fork and Sand Hill Railroad Company recover of The West Virginia Transportation Company its costs in this case expended in the circuit court of Wood county.

REVERSED.