## CHARLESTON.

### KIRK *v*. NORFOLK & W. R. Co.

Submitted January 18, 1896.—Decided March 25, 1896.

1.  RAILROAD COMPANIES—LIVE STOCK—ORDINARY CARE.

    Where a railroad company leaves its railroad uninclosed through a country where domestic animals are allowed to be at large, and thus exposed to the casualties of the animals getting upon the railroad track, it is the duty of the railroad company through its agents, to use at least ordinary care to avoid unnecessary injury to the animals, when found in the way of a train on the road.

2.  RAILROAD COMPANIES—LIVE STOCK—PASSENGERS.

    The paramount duty of the agents of a railroad company engaged in propelling a train is owed to the persons and property in their charge on the train; and if, in freezing weather, it is found that the use of salt on switches is the only effective mode of freeing them from ice, and thus protecting their passengers and themselves from the dangers consequent upon a wreck, they may avail themselves of this method, although it may have a tendency to lure stock to the track, and endanger their lives.

3.  RAILROAD COMPANIES—LIVE STOCK—PASSENGERS—ORDINARY CARE.

    If the servants of the railroad company in charge of a train, by exercise of ordinary care, can see and save domestic animals which have wandered on the railroad, it is their duty to do so; but this duty must be exercised consistently with the paramount duties they owe to the passengers on the train under their charge.

CAMPBELL & HOLT for plaintiff in error.

J. B. WILKINSON for defendant in error, cited Thornton R. R. Fences & Private Crossings, §§ 300, 321; 73 Ala. 244; 88 Ala. 453; 44 Kan. 329; 27 Mo. App. 394; 29 Mo. App. 432; 75 Mo. 518; 19 Mo. App. 411; 71 N. C. 222; 52 Ark. 402.

ENGLISH, JUDGE:

This was a civil action brought by G. W. Kirk against the Norfolk & Western Railroad Company, before T. J. Mead, a justice of the peace of Logan county, for a wrong

alleged to have been committed by the defendant, in which damages to the amount of three hundred dollars were claimed.

In the complaint filed before the justice, the plaintiff alleged that between the 1st day of October, 1892, and the 1st day of March, 1893, the defendant killed three oxen, and crippled another one, which belonged to the plaintiff, of the value of forty five dollars each for two that were killed and sixty five dollars for the other, and twenty five dollars for the one that was crippled.

On the 17th day of June, 1893, the case was heard, and judgment rendered for the plaintiff for one hundred and sixty dollars, with interest till paid and costs. An appeal was taken to the circuit court. An amended complaint was filed. The plea of not guilty was interposed. Issue was joined. A jury was waived, and the matters of law and fact were submitted to the court, and resulted in a finding for the plaintiff, and assessing his damages at one hundred and twenty five dollars. The defendant moved the court to set aside its finding, as contrary to the law and the evidence, and grant it a new trial, which motion the court overruled, and entered judgment for the plaintiff, The defendant excepted, and took a bill of exceptions, setting forth the evidence introduced upon the trial of said cause, and thereupon the defendant applied for and obtained this writ of error.

Now, the injuries complained of occurred at different times. The evidence shows that about the 15th day of December, 1892, the plaintiff found one of his work oxen had been killed, about one hundred yards below the Vinson switch, on the Norfolk & Western Railroad, in Logan county, W. Va. The steer was badly bruised up, and some of its limbs broken, and it was lying by the side of the railroad track. He did not see it killed. It was worth forty dollars. This was all the evidence adduced in regard to the killing of this steer. The testimony is entirely silent as to the circumstances under which it was killed. So far as appears, it may have been killed in the night, when it could not have been seen. It may have come suddenly on to the railroad track and no negligence could prop-

erly have been imputed to the defendant; and the burden of proving negligence rests upon the plaintiff, so that, as to this steer, the court surely would not be warranted in assessing any damages against the defendant. Another one of the plaintiff's steers was found dead by plaintiff lying near the railroad track, about two weeks after the first one was killed, at the Breeden switch, in said county, on the line of said railroad. This steer had both of its hind legs broken, and was lying on the switch. He identified the steer, but knew nothing of the circumstances attending the killing. A witness however, by the name of Ferguson who resides near the Breeden switch, states that some time in January, 1893, he saw an ox which belonged to the plaintiff struck by a train near said switch, that he heard the train coming down the creek, and looked out of the window of his house, and saw some cattle standing near the track; that one of the plaintiff's steers was struck, and thrown off of the main track on to the switch. It was badly crippled but not killed, and shortly afterwards it was buried by the railroad hands working on that section. This train whistled just before or just about the time it came in sight, and was running fast. He heard but the one whistle, which sounded like it was for a whistle post. If any other alarm was given before the steer was struck, he did not hear it. He was about fifty feet from the track where the steer was struck. That stock could have been seen about one hundred and seventy five or two hundred yards from the direction of the approaching train. It was a passenger train, and did not appear to slacken its speed either before or after striking the steer. This occurred in the evening. Now, it will be perceived that the cattle, when seen by the witness Ferguson, were not on the track, but were standing near it. He was only fifty feet away, and could see the position of the cattle. At what time this steer came on to the track, so as to be in the way of the train, does not appear. He may have been alarmed by the whistle or the noise of the approaching train, and have atttempted to cross the track. At any rate, he went on to it, and his hind legs being broken would indicate that he was moving along the track in front of the train, or at-

tempting to leave it. How near the train was when this occurred does not appear, but it must have been very near, as it was a passenger train, and was approaching rapidly, while the ox was changing his position from near the track on to the track itself. From this testimony, we may readily infer that when the cattle were first seen by the trainmen, they were near the track, but not on it, as Ferguson so places them when he heard the whistle of the rapidly approaching train. The cattle could have been seen, say, for two hundred yards; Ferguson says, from one hundred and seventy five to two hundred. A train running at the rate of twenty five miles an hour would run two hundred yards in about fifteen seconds, which would allow the steer but a quarter of a minute to change his position after the train came in sight; and, as the engineer states, the train could not have been stopped if he had had the entire two hundred yards in which to stop after the steer came on the track, but, so far as appears, he must have stepped on the track immediately in front of the train, and no amount of diligence on the part of those in charge of the train could have prevented the collision or the death of the steer. Under these circumstances, we think the court erred in finding against the defendant the value of this steer.

About the 15th of January, 1893, the plaintiff had another steer killed, and a fourth one crippled, at or near Vinson switch, in said county. He did not see it done. The one killed was found lying near the track, and the crippled one was also found near the railroad track. The one killed was worth forty dollars, and the damage done the crippled one was at least twenty five dollars. The only testimony in regard to the circumstances of this last occurrence is that detailed by one William Kirk, who states that he was working near said Vinson switch, hauling saw logs; that a short time before the killing of this last steer and crippling another at said switch, about the 15th day of January, 1893, some salt had been used at said switch, and it attracted the cattle which were being used there to haul saw logs; that the railroad at that point, and for some distance above and below, was not inclosed in any way, there being no station or depot, only a switch to receive saw logs

on the cars; that, on that evening, he noticed the cattle at the switch, licking where the salt had been used, and he drove them away, fearing a train would come along and kill some of them. After driving them away, he returned to his log shanty, on the opposite side of the creek. A few moments afterwards, he heard a train coming down the creek, and stepped out of his shanty, and saw the engine run in among the cattle, which had returned, and were again licking salt at the switch. He went across to the railroad track, and found one ox killed, and one crippled, both of which belonged to plaintiff. He describes the injuries received by the cattle, and says they were both found near the switch, and were part of the cattle which he had a short time before driven away from the switch. This was at or near dusk. The train consisted of a locomotive, baggage car, and two passenger coaches, and was running about twenty five miles an hour, and, after striking the cattle, kept on at the same rate without stopping. Stock could have been seen a distance of about two hundred or three hundred yards on the track from the direction in which said train was approaching. If any alarm was sounded by either bell or whistle, he did not hear it. Now, it will be perceived that there is no evidence that these cattle were on the track at the time this train came in sight of the switch. They had been driven away by the witness Kirk a few minutes before, but when they returned he does not know, and does not state. He states that he saw the engine run in among the cattle when he stepped out of his shanty, but when they returned he does not know or say. So far as the evidence shows, the cattle may have gone on the track immediately in front of the approaching train. If they had been on the track sooner, it must be presumed that self preservation, if nothing else, would have prompted the trainmen to do their duty by sounding the alarm; and the fact that no alarm was sounded strongly indicates that nothing was seen on the track; and it is incumbent on the plaintiff to show that the cattle were on the track, and were killed and crippled by the negligence of the defendant.

It is contended by counsel for the defendant in error that the use of salt in thawing out the switches, and thus pre-

venting the accumulation of ice from throwing the train from the track or creating such a liability, which had the effect of attracting cattle to the switch, was negligence on the part of the plaintiff in error, and he cites *Brown* v. *Railroad Co.*, 27 Mo. App. 394, and *Morrow* v. *Railroad Co.*, 29 Mo. App. 432, in support of his contention. An examination of said authorities, however, shows a very different state of facts. In the first named case the railroad company allowed quantities of salt to be piled on and near its track, and to remain there after it knew the salt was there, by reason of which a horse was attracted to it, and killed. In the second case, several merchants had a refrigerator near the railroad track, and the brine running from said refrigerator caused the ground near the railroad to be saturated with brine, which attracted a cow to the track, which was killed. It was shown that the railroad had notice, and had neglected to take any steps to correct it, and this was held to be negligence on the part of the railroad, and that it was liable. It is, however, shown in the case under consideration, that the use of salt at switches is an absolute necessity, to protect the lives of passengers and others that travel on railroad trains, and not to use it would, in case of accident caused by such failure, be regarded as an act of negligence. In the case of *Blaine* v. *Railroad Co.*, 9 W. Va. 252 (point five of syllabus) this Court held: "There is no law in this state of general operation requiring any person to fence his land unClosed; but the person who leaves his land unInclosed takes the risk of intrusion thereon by domestic animals of others running at large, and the owner of such animals, in allowing them to run at large, takes the risk of their loss, or of injury to them by unavoidable accident, from any danger into which they may happen to wander." And in point 12 the law is thus stated: "Where a railroad company leaves its railroad uninclosed through a country where domestic animals are allowed to be at large, and thus exposed to the casualties of the animals getting upon the railway track, it is the duty of the railway company, through its agents, to use at least ordinary care to avoid unnecessary injury to the animals when found in the way of a train on the road. The first and paramount

duty of the agents of the company is a due regard for the
safety of the persons and property in their charge on the
train, for which they are held to a high degree of care; and,
so far as consistent with this paramount duty, they are
bound to the exercise of what in that peculiar business
would be ordinary and reasonable care to avoid unnecessary
injury to animals causally coming upon this uninclosed
road; and if the servants of the railroad company in charge
of a train can, by exercise of ordinary care, see and save
domestic animals which have wandered on the railroad, it
is their duty to do so; and for any injury to animals aris-
ing from a neglect of such care the company is liable in
damages to the owner." See, also, *Baylor* v. *Railroad Co.*,
Id. 271, where this Court held it to be the duty of the ser-
vants of the railroad company, so far as consistent with
their other and paramount duties, to use ordinary care to
avoid injuring cattle on the track. They are bound to
adopt the ordinary precautions to discover danger, as well
as avoid its consequences after it becomes known. And,
applying these principles to the facts and circumstances of
this case, we conclude that the court erred in fixing any li-
ability upon the defendant by reason of imputed negligence
upon its part.

On appeal, however, to the circuit court, the plaintiff
filed an amended complaint, in which he alleged that the
defendant, on the last day of January, 1893, unlawfully killed
and appropriated to its own use three oxen of the plaintiff
of great value, to wit, of the value of one hundred and
twenty five dollars; and the testimony shows that one of said
oxen was lying on the Breeden switch, with both of its
hind legs broken; and, as it was in good order, the plaintiff
proposed to take charge of it, and use it for beef, but the
section foreman refused to let him have it, and the steer
was buried by said foreman, and workmen under his con-
trol. The witness also states that this steer was worth six-
ty dollars; but as we can not say whether this valuation
applied to the steer in its crippled or mutilated condition,
to the value of its carcass for beef, or to the steer as it
stood on the railroad when struck by the train, we are of
opinion that the circuit court had before it no data by

which to determine the value of said steer; and while we are of opinion that the plaintiff was entitled to something for the dead carcass of the steer demanded by him, and refused by the section boss, we can not determine the amount, and the court below was not warranted on the evidence in fixing any amount.

For these reasons, the judgment complained of must be reversed, the finding set aside, and the case remanded.

BRANNON, JUDGE:

We hold the company not responsible for killing or crippling the cattle, but we think it responsible for not yielding to the owner one of the cattle after it was killed, and demanded by the owner, and as the complaint called for damages for its conversion, the plaintiff ought to have judgment for that much for its conversion. But no evidence showed its value when dead, and therefore only nominal damages could be given for it. As we do not know how much to subtract for that steer from the amount of damages found against the company, and could only subtract nominal damages, we can not say the amount of grievance to the company is reduced below the jurisdictional amount of one hundred dollars.

DENT, JUDGE:

I dissent from the conclusion in this case, for the reason that in my view of it the plaintiff was entitled to recover not less than thirty dollars, which would reduce the residue of the recovery below the jurisdiction of this Court, and therefore the appeal, in any event, should have been dismissed for want of jurisdiction, in accordance with the settled rule established in the case of *Love* v. *Pickens*, 26 W. Va. 341, as follows, to wit: "To give this Court jurisdiction in a cause involving matters simply pecuniary, the record must show not only that the party complaining has been prejudiced by the decree or judgment of the inferior court, but also that the amount in controversy in this Court exceeds the value of one hundred dollars, exclusive of costs." In short, every presumption in this Court is in favor of the judgment, and the duty devolves upon

the party complaining to show that he is prejudiced in excess of one hundred dollars. If he falls one cent short, he is not entitled to his appeal. *Greathouse* v. *Sapp*, 26 W. Va. 87; *Neal* v. *Van Winkle*, 24 W. Va. 401; *Bee* v. *Burdett*, 23 W. Va. 744; *Rymer* v. *Hawkins*, 18 W. Va. 309.

But the merits of this case are with the plaintiff. It is the law that in the country where the railroad is not fenced, and cattle are legally permitted to run at large, the company must use at least ordinary care to prevent the injury of stock wandering on the track. The use of salt or anything else that attracts stock upon the track is not ordinary care. If the company would merely scatter the salt along its tracks without excuse for so doing, no one would for an instant pretend that such conduct was not negligence, in the highest degree criminal, creating a nuisance or trap to lure such domestic animals whose systems crave salt to their certain destruction. The company having done this, the question is, has it furnished an unavoidable, justifiable, and reasonable excuse for so doing: It introduced a witness Moloney, who testified, "that he was in the employ of the defendant as road supervisor on the Kenova Division of said railroad, from Kenova to the mouth of the Pigeon; that the road where the injuries complained of occurred was under his supervision; that in cold, frozen, snowy weather the frogs at switches along said line of railroad would get frozen up, and would become dangerous to run trains along said road; that there had been some cold, snowy weather in December, 1892, and that he applied to the superintendent of the division for salt to apply to said switches, by which means they could be kept open, to avoid danger to running trains; that the superintendent refused to send it, unless it was absolutely necessary to use it, as the use of it would attract stock; that some time in January, during a severe spell of weather, it became absolutely necessary to use salt, for the safety of the trains, and several barrels were sent to him to use along his division, and that he distributed it along the line of said road, to be used at the switches and stations, and it was so used, part of it being used at the said Vinson switch prior to the killing and crippling of the steers, about January 15, 1893; that the use

of said salt was absolutely necessary for safety to trains; and that there was no substitute for it." This testimony shows that the company were fully aware of the danger of using salt, but the witness says that its use was absolutely nec essary to keep the frogs and switches free from ice and snow in cold weather, and that there was no substitute for it. Admitting this to be true, then it was the duty of the company, in using it, to provide against the danger thereof, by providing, by necessary fencing or watchmen, to keep stock away from it, not only for the safety of the stock, but of the trains and passengers under its control; for stock, dead or alive, may derail a train as well as ice or snow, and, if a train should have been thus derailed, could the company have escaped liability to injured passengers by showing that the salt which attracted the stock, and caused the accident, was necessarily used in providing for their safety? Such a plea would be treated as ridiculous, on the theory that the company, in providing against a lesser evil, had no right to incur a greater, but that it also should have provided against the greater if it was in its power to do so; and it certainly was at small expense, comparatively, at least, to the risk it was assuming. In deciding such questions, because of the testimony of witnesses, the court can not divest itself of good common sense. It is plain to be seen that while the witness says the use of the salt was absolutely necessary, and that there was no known substitute for it, yet that the real object in its use was to avoid the additional expense caused by the necessary labor involved in keeping the frogs and switches free from ice and snow in cold weather. In other words, it was a "penny wise and pound foolish" policy, causing the unnecessary destruc tion of other people's property, and increasing the dangers to its trains and passengers, which could have been avoided by a small outlay, less than the expense of defending this suit; for it alone will cost the company more than suf ficient to have kept these particular frogs and switches free and clean from snow and ice, and properly lubricated, by manual labor, for many winters—or if the salt was absolutely necessary, which sounds like mere foolishness to an untutored savage at least, to have kept a man on guard

for many cold nights and days, and secured the plaintiff and others from the loss of their stock, and avoided a decision by this Court of that as law which must be repugnant to the sense of justice of every reasonable man not learned in the intricacies of railroad jurisprudence.

To say that the use of salt is the only effective mode of freeing frogs and switches from ice and snow in cold weather is to close our eyes to ordinary human experience. But to say that the use of salt is the only effective mode of freeing frogs and switches from ice and snow in cold weather without an additional expense for manual labor and proper lubricants is, no doubt, true. If the company adopt the cheaper of two modes to accomplish the same purpose, it is no more than justice to require it to provide against the increased danger, occasioned by its choice, to the property of others. If, necessarily, I must maintain for my own benefit that which may be a nuisance to my neighbors, and I can provide against its dangerous character, it is my duty to do so, or be responsible to my neighbor for his loss resulting from my neglect. The company knew that the use of the salt in this instance would result just as it did. It, by a small additional expenditure of labor and money, could have provided against it. This it failed to do, and therefore it should be made to pay the damage. In my opinion, the judgment is just, and should be affirmed.