506 S.E.2d 632

**A & M PROPERTIES, INC., Plaintiff Below, Respondent,**

v.

**NORFOLK SOUTHERN CORPORATION and Norfolk Southern Railway Company, a Subsidiary of Norfolk Southern Corporation, Defendants Below, Petitioner.**

No. 24744.

Supreme Court of Appeals of West Virginia.

Submitted May 13, 1998.

Decided July 15, 1998.

Dissenting Opinion of Justice Starcher Sept. 30, 1998.

Starcher, J., filed dissenting opinion.

Tracey B. Dawson, Steptoe & Johnson, Martinsburg, West Virginia, Attorney for the Respondent.

Clarence E. Martin, III, Martin & Seibert, Martinsburg, West Virginia, Attorney for the Petitioners.

McCUSKEY, Justice:

This certified question comes before the Court upon the petition of Norfolk & Western Railway Co., defendants in a suit in the Circuit Court of Jefferson County. Respondent had commenced a civil suit in the Circuit Court of Jefferson County seeking declaratory judgement that it had obtained a prescriptive easement across active railroad trackage owned in fee simple by the Petitioner, thereby creating a private railroad grade crossing. The circuit court allowed Petitioner's motion to dismiss, in which Petitioner averred, that, as a matter of law, prescriptive easement could not lie against the trackway

of a railroad. Respondents filed a motion to alter or amend the judgement, or in the alternative to certify the question. In response to this motion the circuit court altered its answer, allowing prescriptive easement to lie against the trackway of a railroad and certified the question to this Court. For the reasons enumerated below, we answer the certified question in the negative.

## I.

## FACTUAL AND PROCEDURAL HISTORY

A & M Properties, Inc. (A & M) is the owner of a tract of property in Shepherdstown District, Jefferson County, West Virginia. The Norfolk & Western Railway Co., (N & W) a subsidiary of Norfolk Southern Railway Co., owns a sixty-six foot wide strip of real property running through Shepherdstown District, upon which is laid the trackbed of the Norfolk & Western Railway and which is, for a segment of its length, adjacent to the tract owned by A & M. A & M purchased the aforementioned tract on May 14, 1990, and for a period after that time, along with its various invitees and licensees, made use of a dirt road which extended across the tracks of the Norfolk & Western Railway Co.

A & M claimed that it made use of the crossing over N & W's tracks as a matter of right. A & M also claimed that the railroad had notice of its use from the existence of the crossing and the position of certain buildings on the tract. As N & W had never ordered A & M to desist, A & M's belief was that it had implicit permission from N & W to continue to use the crossing.

In April of 1995, the events which gave rise to this suit transpired. N & W prevented the further use of the grade crossing by A & M by placing a gate across the road on either side of the tracks. Later, the entire portion of the crossing which was on N & W's property was removed by N & W personnel.

Subsequently, A & M brought suit against N & W in the Circuit Court of Jefferson County. A & M alleged that the use of the grade crossing was open and notorious, continuous and uninterrupted for a period of five years on its part, and for more than ten years when the use of the crossing by its predecessors in title was tacked; thus, A & M had established a valid prescriptive easement to cross the track of the Norfolk & Western Railway Co. in the location of the grade crossing. A & M also asked for $10,000.00 in damages as compensation for its inconvenience, deprivation of access, property damage, and additional costs resulting from the destruction of the grade crossing.

N & W made a motion to dismiss alleging that a prescriptive easement would not lie against a railroad trackway, due to the functional equivalence of a railroad to a public highway. The Circuit Court of Jefferson County granted N & W's motion to dismiss. However, the Circuit Court of Jefferson County then granted A & M's motion to alter or amend the judgment and certified the following question to this Court: "Whether West Virginia law provides a cause of action for prescriptive easement against property owned in fee simple by a railroad." The facts of this case, however, show that the easement sought by plaintiff was made not merely against property owned in fee simple by a railroad, but upon the actual trackway of the railroad. Therefore, answering this question in the context of these particular facts, it is the opinion of this Court that it does not.

## II.

## STANDARD OF REVIEW

The standard of review to be applied in reviewing a certified question was recently set forth in Syllabus Point One of *Gallapoo v. Wal–Mart Stores, Inc.* 197 W.Va. 172, 475 S.E.2d 172 (1996), wherein we held that "[t]he appellate standard of review of questions of law answered and certified by a circuit court is *de novo.*"

## III.

## DISCUSSION

It is axiomatic to state that the Constitution of West Virginia is the supreme law of this State. In that august document we find language to the effect that "[r]ailroads

heretofore constructed, or that may hereafter be constructed in this State, are hereby declared public highways...." *Constitution of West Virginia,* Art. XI, § 9. This was no innovation by our founders, for, as Lord Chief Justice Hale noted more than three hundred years ago in the legal treatise "De Portibus Maris", "if a man set out a street in or near a building on his own land, it is no longer bare private interest, but is affected by a public interest." Lord Chief Justice Hale, "De Portibus Maris", 2 *Hargrave's Law Tracts,* 78 (Hargrave, ed.) *quoted in Laurel Fork & Sand Hill Railroad Co. v. West Virginia Transportation Co.,* 25 W.Va. 324, 336 (1884). This ancient doctrine regarding construction of private thoroughfares for public use, no less relevant now than when it was first enunciated, is the hinge upon which the issue presented by this case turns.

Railroads in West Virginia have traditionally been recognized as uniquely situated corporations. No less than five sections of Article XI of the Constitution of this state deal with railroads. The special status of railroads as quasi-public corporations was foremost in the minds of the framers of our Constitution. Only twelve years after the adoption of our current Constitution, this Court addressed its provisions concerning railroads and found that the result of the combination of these provisions was that railroads had the status of a quasi-public corporation. *Laurel Fork & Sand Hill Railroad Co. v. West Virginia Transportation Co.,* 25 W.Va. 324 (1884).

■■■ As recently as 1982, this Court continued to state that railroads have a dual public-private status. In that year, Justice Neely provided a clear exposition of the traditional current of thought regarding the status of railroads when he stated that despite the fact that they were private corporations "railroads are not viewed strictly as private corporations since they are publicly regulated common carriers. Essentially, a railroad is a highway dedicated to the public use. This dedication imparts to the railroad the status of a quasi-public corporation." *Marthens v. B & O Railroad Co.,* 170 W.Va. 33, 37, 289 S.E.2d 706, 711 (1982) citing *Ecking-*

*ton & Soldiers' Home R. Co. v. McDevitt,* 191 U.S. 103, 24 S.Ct. 36, 48 L.Ed. 112 (1903); *United States v. Trans–Missouri Freight Assoc.,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897).

■■■ It is the opinion of this Court that a departure from the plain and unambiguous language of our Constitution and from over a century of precedent is not advisable. Therefore, this Court finds that a railroad is, as the Constitution says, a "public highway." *Constitution of West Virginia,* Art. XI, § 9. Having acknowledged this to be true, application to the case at bar is clear. It has been settled law in this State for almost a century that "[t]he public easement in the public highways ... dedicated to the use of the public by individuals ... cannot be lost to the people by ... the acts of individuals." Syllabus point 4, *Ralston v. Town of Weston,* 46 W.Va. 544, 33 S.E. 326 (1899). Here, despite A & M's prior use of the crossing, they are not entitled to have continued rights to use it as they may not appropriate the property of a quasi-public corporation which is used in the public interest by "prescription, adverse possession under the statute of limitations, or equitable estoppel, as the people cannot be deprived of their sovereign rights in any of these ways." *Bauer Enterprises v. City of Elkins,* 173 W.Va. 438, 317 S.E.2d 798 (1984); *Huddleston v. Deans,* 124 W.Va. 313, 21 S.E.2d 352 (1942); Syllabus Point 5, *Ralston v. Town of Weston,* 46 W.Va. 544, 33 S.E. 326 (1899).

Respondent cites *Dulin v. Ohio River Railroad Co.,* 73 W.Va. 166, 80 S.E. 145 (1913), as controlling authority for the proposition that a prescriptive easement may be created within a railroad right-of-way. There are major factual distinctions between this case and *Dulin. Dulin,* for example, involved a mere easement to the railroad to cross the land of a dominant estate, not, as in this case, a trackway owned in fee simple by the railroad. The successors in interest of the grantor of the easement to the railroad subsequently claimed they had cultivated a small strip within the granted easement for the requisite number of years to establish title by adverse possession. This Court in *Dulin* found against these plaintiffs, and ex-

plicitly noted that they had not adversely possessed the land in question as their "cultivation of a portion of the right-of-way land was not necessarily hostile or adverse to the railroad company's right." *Dulin*, 73 W.Va. 166, 172, 80 S.E. 145, 147. Judge Williams, writing for the majority in *Dulin*, noted parenthetically that "Judge Miller and myself think that the doctrine of adversary possession does not apply to a railroad company's right of way, and the other members of the court hold that it does" *Dulin*, 73 W.Va. at 170, 80 S.E. 145. Adverse possession against the trackway of a railroad *might* be said to exist under this ambiguous language. However, this hypothetical language was mere dicta in *Dulin* and will not stand as precedent under our policy that "[o ]biter dicta or strong expression in the Court's opinion, where such language was not necessary to the decision of the case, will not establish a precedent." *In re Kanawha Valley Bank*, 144 W.Va. 346, 382, 109 S.E.2d 649, 669 (1959), *quoting Chesapeake & Ohio R. Co. v. Martin*, 154 Va. 1, 152 S.E. 335 (1930). Therefore, in light of this policy and to put an end to any latent ambiguity remaining as a result of *Dulin*, this Court feels compelled to set forth an unambiguous standard in the light of the unambiguous language found in our Constitution.

While this Court has not been presented with this issue for many years, the Supreme Court of Virginia has seen it quite recently in the case of *Norfolk & Western Railway Company v. Waselchalk*, 244 Va. 329, 421 S.E.2d 424 (1992). In that case the Supreme Court of Virginia cited the principle established in *City of Lynchburg v. Chesapeake and Ohio Ry.*, 170 Va. 108, 195 S.E. 510 (1938), that "no prescriptive right can be acquired in property affected with a public interest or dedicated to a public use." *City of Lynchburg v. Chesapeake and Ohio Ry.*, 170 Va. at 116, 195 S.E. at 514. The Supreme Court of Virginia then added that "[t]here can be little doubt that this railroad property is affected with a public interest" as numerous trains passed over the crossing each day, exactly as they do through the grade crossing in Shepherdstown which is of particular concern in this case. *Waselchalk*, 244 Va. at 330, 421 S.E.2d at 425.

We approve of this stance of the Supreme Court of Virginia. As under Article XI, Section 9 of the Constitution of West Virginia, the track of a railroad is to be considered a public highway. As neither adverse possession, prescriptive easement, nor equitable estoppel may lie against a public highway, no party may establish an interest in the trackway of a railroad through any of these methods. This is, of course, subject to the limitation implied by *Marthens, supra*, and supported by *Waselchalk, supra*, that the trackway must be in use for railroad purposes.

To those who claim that this standard grants too much protection to railroads, it must be remembered that it is founded in our Constitution and also, that in exchange for such special protection as our Constitution gives to the trackway of a railroad, there are equal and opposite responsibilities enjoined upon these quasi-public corporations. This principle is not an innovation, but is as old as our nation. Lord Ellenborough noted that if a landowner or corporation would take the benefit of providing a public service, "he must as an equivalent perform the duty attached to it on reasonable terms." *Aldnutt v. Ingels*, 104 Eng.Rep. 206, 211, 12 East 527, 537 (K.B.1810). Railroads are not free to act in numerous intimate functions of their business in which normal corporations are at liberty to act as they please without any restraint save that of the market; rather, they are governed by the state as to the rates which they charge and in the employment of their property which is devoted to a public use. Syllabus Point 3, *Laurel Fork & Sand Hill Railroad Co. v. West Virginia Transportation Co.*, 25 W.Va. 324 (1884).

Not only are the fundamental principles of our law engaged here, but there are sound policy reasons for this stance as well. This Court does not wish to encourage the creation of impromptu, unmarked, grade crossings by every property owner who wants to create a shortcut across the trackway of a railroad. The dangers to public safety of such a practice, especially when continued for such an amount of time as to establish adverse possession or a prescriptive easement

in a grade crossing, are all too high. It is equally true that the inconvenience to railroads of being forced to maintain grade crossings created at any place a hostile party chose would unnecessarily burden the flow of goods and services to consumers.

## IV.

## CONCLUSION

We reiterate that, for the reasons explained above, under Article XI, Section 9, of the Constitution of West Virginia, the track of a railroad is to be considered a public highway; as neither adverse possession, prescriptive easement, nor equitable estoppel may lie against a public highway, no party may establish an interest in the trackway of a railroad through any of these methods, so long as the trackway continues to be used for railroad purposes. Therefore, the amended question certified from the Circuit Court of Jefferson County is answered in the negative, and this matter is remanded to that Court for further proceedings.

Certified Question Answered.

STARCHER, Justice, dissenting:

(Filed Sept. 30, 1998)

The majority opinion, on behalf of a railroad corporation, obfuscates and overrules West Virginia law without even hinting that it is doing so. The opinion reasons that railroad crossings interfere with the efficient flow of commerce; the majority forgets that farmers, landowners and businesses use railroad crossings for commerce as well. Rather than balancing the interests of farmers, businesses and landowners against railroads, the majority simply tips the scale of justice to favor railroads alone. I therefore dissent.

## A.

### *Overturning Established Law without Saying So*

The majority opinion, without saying so, overturns settled West Virginia law that has

protected farmers, businesses, and landowners for 85 years.

In *Dulin v. Ohio River R. Co.*, 73 W.Va. 166, 80 S.E. 145 (1913), this Court ruled that a railroad is not a "public highway" for purposes of the law of adverse possession.[1]

We held in Syllabus Point 5 of *Dulin* that: "The doctrine of adversary possession is applicable to land acquired by a railroad company for its right of way." (Emphasis added.) In so holding, the *Dulin* majority stated that "the right of a railroad company does not stand on a par with public highways generally...." 73 W.Va. at 171, 80 S.E. at 147.

Coincidentally, it is Syllabus Point 5 of the majority opinion in the instant case that adopts the directly opposite position from *Dulin*; it states in pertinent part: "... *neither adverse possession, prescriptive easement, nor equitable estoppel may lie against ... the trackway of a railroad ... so long as* the trackway continues to be used for railroad purposes." (Emphasis added.)

The majority opinion in the instant case is simply not being honest in its claim to be "put[ting] an end to any latent ambiguity remaining as a result of *Dulin* ...." 203 W.Va. at 193, 506 S.E.2d at 636. Syllabus Point 5 of *Dulin* is not ambiguous, latently or otherwise. As the foregoing quotations demonstrate, Syllabus Point 5 of the majority opinion directly overrules Syllabus Point 5 of *Dulin*, a settled rule of West Virginia property law that has guided our circuit courts and our property owners for 85 years.

Justice Neely, in *Kline v. McCloud*, 174 W.Va. 369, 380, 326 S.E.2d 715, 727 (1984) (Neely, J., dissenting) quoted language that is appropriately applied to the majority opinion in the instant case:

"If the Court deems it necessary to disregard precedent, let it boldly overrule a prior decision and not, with passionate intensity, manoeuvre interstitially among the lines of cases written only yesterday. I am reminded of Lord Holt's protest, in 1704: "... these scrambling reports ... will make us appear to posterity for a

1. The prescriptive easement claimed by A & M Properties in the instant case is the same sort of

claim as an adverse possession claim, both being equitable interests in property acquired by use.

parcel of blockheads." *Slayter v. May*, 2 Ld.Raym. 1072 [1704]."

Notably, our law requires us to have particularly strong reasons for overturning decisions that are related to established property rights.

We stated in *Hock v. City of Morgantown*, 162 W.Va. 853, 856, 253 S.E.2d 386, 388 (1979):

> Predictability is at the heart of the doctrine of *stare decisis*, and regardless of what we think of the merits of this case, we must be true to a reasonable interpretation of prior law in the area of property where certainty above all else is the preeminent compelling public policy to be served.

The majority opinion, by pretending not to overturn the rule established in *Dulin*, ignores this fundamental principle of law.

### B.

### *Farmers, Businesses and Landowners Lose their Established Rights*

Based on *Dulin*, it has been the law in this state for 85 years that a farmer, landowner or business person, like the respondent A & M Properties, who has openly used a railroad crossing for many years—and who may have even built buildings, paved roads, or made other expensive improvements in reliance on that crossing—*may* have some rights to the continued use of that crossing.

Under *Dulin*, if the railroad takes a notion to tear up and eliminate a crossing, the business, farmer, or landowner has the right to go to court and to try to show that this would be unfair. This right is fair and reasonable—it is hardly a big deal. And that is what occurred in the instant case.

But thanks to the majority opinion, A & M Properties—and all other similarly situated businesses, farmers, and landowners—are completely and entirely "out of court and out of luck."

Under the majority opinion, regardless of how long the business, farmer or landowner has used a crossing, or what investments they may have made—and regardless of the past acquiescence of the railroad in the establishment and use of the crossing—the business, farmer or landowner *has no rights whatsoever.*

This result is unfair and, as demonstrated below, it is not required by law.

### C.

### *Let's Go for a Drive on the N & W*

The majority opinion, in stripping farmers, businesses, and landowners of their right to use the courts to protect themselves, relies upon language in Article XI, Section 9 of our *Constitution* that says railroads are "public highways." The majority opinion, *reversing* the *Dulin* court, *sub silentio*, decides that railroads are "public highways" for purposes of the law of prescriptive easements, adverse possession, and equitable estoppel.

So, if a railroad is really a "public highway," then can I drive my car on the Norfolk and Western line, just like I do on Corridor G?

If a railroad is really the same as a "public highway," will the West Virginia State Police run radar on the CSX tracks to enforce posted track speed limits, just like they do on I–79?

Most importantly, if a railroad is really a "public highway," then when a railroad decides to sell a piece of its property—do we, the public, get the money?

To all of these questions—and to a dozen others that anyone can think of—the answer is clearly "no."

Obviously, although the majority opinion ignores this principle, railroads are not "public highways" for all purposes. It is up to this Court, or the Legislature, to decide in which cases they are to be treated as "public highways." And there is certainly not a word in our *Constitution*, or in any statute, saying that privately-owned railroad land is a "public highway" for purposes of prescriptive easement law.

In *Dulin*, this Court, recognizing that railroads are not "public highways" for all purposes, used common sense and fairness in developing the common law of adverse possession. We concluded that the same broad

protection from claims of adverse possession that we give to true publicly-owned highways need not be given to privately-owned railroad property—especially when the railroad's interests are in conflict with substantial property interests of other private parties.[2] This was a sound decision.

## D.

### The World Will Not End If Railroad Rights are Limited

If there is no written law that dictates the result reached by the majority opinion, what is left? The majority opinion—with no record to support these speculations—predicts "dangers to public safety" and an "unnecessar[y] burden [on] the flow of goods and services to [West Virginia] consumers" if a railroad has to be accountable in our courts to citizens who have prescriptive easement claims.

However, the majority opinion inexplicably ignores the examples of the states of New York and Illinois (examples that were cited in the briefs in this case).

New York and Illinois, states that have a tremendous amount of railroad track (much more than West Virginia),[3] allow their citizens to assert prescriptive easement rights against railroads.[4]

Yet I think it is safe to say that New York and Illinois have not suffered an epidemic of carnage at the crossings, or a rash of rampant inflation, as a result of their citizens being able to assert prescriptive rights against railroads.

Marmaduke Dent, the eminent and humane West Virginia jurist who served on this Court from 1893 to 1904, once commented that a decision exonerating a railroad for negligently killing cattle, after first attracting them to the tracks with salt, was "repugnant to the sense and justice of every reasonable man not learned in the intricacies of railroad jurisprudence." *Kirk v. Norfolk & W.R. Co.,* 41 W.Va. 722, 732, 24 S.E. 639, 643 (1896) (Dent, J., dissenting).

The majority opinion has the same characteristics that Judge Dent[5] identified over 100 years ago. The majority opinion worries about the "inconvenience" to railroads of having to maintain crossings. What about the inconvenience to businesses, farmers and landowners who have to drive dozens of miles because a railroad unilaterally tears up a crossing that has been used for decades? Or the unnecessary burden on businesses, consumers or employees who are caught on the wrong side of the tracks, and who must drive many miles out of their way to cross those tracks to conduct business?[6]

Stripped of its legal veneer, the majority opinion's unsupported (and in my view, ridiculous) contention that there will be an impairment of our general economic well-being, if railroads have to be accountable in court, is eerily reminiscent of a time I had thought to be past, when courts too often tilted the balance in favor of large industrial corporations and moneyed interests—and against

---

**2.** Without pretending to have comprehensively researched the issue, it seems to me that the constitutional statement that railroads are "public highways" is principally in furtherance of railroads' ability to acquire land by eminent domain, and to preserve access to rail transportation for citizens and for competing businesses.

This constitutional language has never been held to mean that railroad property, clearly owned by a private corporation, is to be treated the same as a publicly-owned highway, for purposes of prescriptive easement law.

**3.** According to the Association of American Railroads, in Illinois 41 railroads operate 7,633 miles of track, and in New York, 37 railroads operate 3,715 miles of track. In West Virginia, three major railroads operate 2,536 miles of track, while five local railroads operate 104 miles of track.

**4.** *See Erie R. Co. v. Kaplowitz,* 23 Misc.2d 807, 137 N.Y.S.2d 261 (N.Y.Sup.1954); *Wehde v. Regional Transp. Authority,* 237 Ill.App.3d 664, 178 Ill.Dec. 190, 604 N.E.2d 446 (Ill.App.1992).

**5.** At the turn of the century when Marmaduke Dent served on our State's highest court, the Court was composed of four jurists with the title of "Judge."

**6.** This case has absolutely nothing to do with people going out under cover of darkness and establishing clandestine railroad crossings that will forever burden a railroad. Prescriptive easements and similar property rights are only established by longstanding, notorious, permissive or hostile uses of property.

farmers, landowners, wage laborers and small businesses—all in the name of business efficiency.[7] Such an anachronistic, unnecessarily harsh, "tough luck" approach to jurisprudence is troubling.

## E.

### A Fair and Balanced Rule

In contrast to the majority opinion's approach—denying any and all rights whatsoever to farmers, business people and landowners, when these average citizens' interests are in a legitimate conflict with the interests of railroads—I would advocate a more balanced, fair, and even-handed approach.

I would craft a particular rule for prescriptive easement claims against railroads, recognizing the railroads' unique public-carrier, semi-monopoly character—and requiring a stricter showing of equity and necessity on the part of those seeking prescriptive rights against a railroad than in an ordinary easement case.

Such a rule would be fair to railroads and landowners, and would protect the public interest. Crafting such a rule is entirely within this Court's proper powers and role in evolving the common law of prescriptive easements.

However, instead of taking such a balanced approach, the majority opinion unnecessarily entirely strips farmers, businesses and property owners of rights they have enjoyed for over 85 years. The author of the majority opinion has, in effect, "stood *stare decisis* on its ear." [8]

## F.

### Correcting the Mistake

Because a majority of this Court has failed to protect important and longstanding property rights, I hope that the Legislature—exercising its power to modify the common law—will promptly restore the rights that the majority opinion has extinguished.

For the foregoing reasons, I respectfully dissent.

7. For an inspiring, educational and entertaining discussion of Judge Dent and his role in the legal effort to treat railroads as responsible citizens (that is, like everyone else), *see* Ronald L. Lewis, *Transforming the Appalachian Countryside*, Ch.4, "Making Capital Secure: Law and the Industrial Transformation of West Virginia," University of North Carolina Press 1998. *See also* John Reid, "Henry Brannon and Marmaduke Dent: The Shapers of West Virginia Law," 65 W.Va. L.Rev. 19–37, 99–128 (1962–63); John Reid, *An Ameri*-can Judge—Marmaduke Dent of West Virginia, New York University Press, 1968.

8. *See* McCuskey concurrence in *Tiernan v. Charleston Area Medical Center, Inc.,* 203 W.Va. 135, 159, 506 S.E.2d 578, 602 (1998) (McCuskey, J. concurred), in which Justice McCuskey accused Justice Starcher of "stand[ing] the West Virginia Constitution on its ear" in Starcher's dissent.